Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
February 5, 2018

**2018 CO 10**

**No. 15SC627, <u>Smokebrush Foundation, Katherine Tudor, and Donald Herbert Goede,
III v. City of Colorado Springs</u>—Colorado Governmental Immunity Act—Sovereign
Immunity.**

In this case, the supreme court reviews the court of appeals division's conclusion
that petitioners' claims against respondent city are barred under the Colorado
Governmental Immunity Act ("CGIA").  Petitioners asserted a number of tort claims for
alleged injuries resulting from airborne asbestos released during demolition activities
on the city's property in 2013 and from the subsurface migration of coal tar pollutants
created by historical coal gasification operations on the city's property.  The division
concluded that each of these claims was barred under the CGIA, and this case now
presents two issues for the supreme court's consideration.

First, the court addresses whether petitioners' asbestos-related claims fall within
the waiver of immunity set forth in section 24-10-106(1)(c), C.R.S. (2017), for injuries
resulting from the dangerous condition of a public building.  The CGIA defines a
"dangerous condition," in pertinent part, as a physical condition of a facility or the use
thereof that constitutes an unreasonable risk to the health or safety of the public and

that is proximately caused by the negligent act or omission of the public entity in "constructing or maintaining" such facility. § 24-10-103(1.3), C.R.S. (2017). Because the complete and permanent demolition of a building does not come within the plain meaning of the terms "constructing" or "maintaining" a facility, the court concludes that the dangerous condition of a public building exception does not apply.

Second, the court addresses whether petitioners' coal tar-related claims fall within the waiver of immunity set forth in section 24-10-106(1)(f), C.R.S. (2017), for injuries resulting from the operation and maintenance of a public gas facility when, as here, petitioners' cause of action accrued after the CGIA's enactment but the operation and maintenance of the facility that caused the injury occurred before that enactment. Because petitioners have established that (1) the facility at issue was a public gas facility, (2) petitioners' claimed injuries from the coal tar contamination resulted from the operation and maintenance of that facility, and (3) petitioners' coal tar-related claims accrued after the CGIA's enactment, the court concludes that under the plain language of section 24-10-106(1)(f), the City has waived its immunity for these claims.

Accordingly, the supreme court affirms the portion of the division's judgment requiring the dismissal of petitioners' asbestos-related claims but reverses the portion of the judgment requiring the dismissal of petitioners' coal tar-related claims.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 10

## Supreme Court Case No. 15SC627
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA228

### Petitioners:

Smokebrush Foundation, Katherine Tudor, and Donald Herbert Goede, III,

v.

### Respondent:

City of Colorado Springs.

## Judgment Affirmed in Part and Reversed in Part
*en banc*
February 5, 2018

**Attorneys for Petitioners:**
Law Offices of Randall M. Weiner, P.C.
Randall M. Weiner
Annmarie Cording
  *Boulder, Colorado*

Law Office of Paul Zogg
Paul Zogg
  *Boulder, Colorado*

**Attorneys for Respondent:**
Treece Alfrey Musat P.C.
Robert J. Zavaglia, Jr.
Kathleen M. Byrne
  *Denver, Colorado*

**Attorney for Amicus Curiae Colorado Municipal League:**
Dianne M. Criswell
  *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
Bachus & Schanker, LLC
Scot C. Kreider
  *Denver, Colorado*


**Attorneys for Amicus Curiae State of Colorado:**
Cynthia H. Coffman, Attorney General
Allison R. Ailer, Assistant Attorney General
Grant T. Sullivan, Assistant Solicitor General
  *Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE MÁRQUEZ** dissents in part and concurs in part and **JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent in part and concurrence in part.

¶1 Petitioners Smokebrush Foundation, Katherine Tudor, and Donald Herbert Goede, III (collectively, "Smokebrush") own property on which the non-profit foundation operates a wellness center in the City of Colorado Springs. Smokebrush sued the City, contending that Smokebrush's property had been contaminated by pollutants from an adjacent property owned by the City. Specifically, Smokebrush asserted a number of tort claims for injuries from airborne asbestos released during demolition activities in 2013 and from the subsurface migration of coal tar pollutants created by historical coal gasification operations on the City's property.

¶2 The City moved to dismiss for lack of jurisdiction, claiming governmental immunity from suit under the Colorado Governmental Immunity Act, sections 24-10-101 to -120, C.R.S. (2017) ("CGIA"). Smokebrush responded that the City had waived immunity under section 24-10-106(1)(c) (waiving immunity for claims for injuries resulting from a "dangerous condition of any public building") and section 24-10-106(1)(f) (waiving immunity for claims for injuries resulting from the "operation and maintenance of any public . . . gas facility") of the CGIA. The district court agreed with Smokebrush and denied the City's motion to dismiss. In a unanimous, published opinion, however, a division of the court of appeals reversed and remanded with instructions to grant the City's motion. Smokebrush Found. v. City of Colo. Springs, 2015 COA 80, ___ P.3d ___. We granted Smokebrush's petition for certiorari and now affirm in part and reverse in part the division's judgment.[1]

_____

[1] We granted certiorari to review the following issues:

¶3 With respect to Smokebrush's claims regarding airborne asbestos released during the 2013 demolition activities, we conclude that the City has not waived immunity under section 24-10-106(1)(c)'s dangerous condition of a public building exception. The CGIA defines a "dangerous condition," in pertinent part, as a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public and that is proximately caused by the negligent act or omission of the public entity in "constructing or maintaining" such facility. § 24-10-103(1.3), C.R.S. (2017). Because the complete and permanent demolition of a building does not come within the plain meaning of the terms "constructing" or "maintaining" a facility, the dangerous condition of a public building exception does not apply.

---

1. Whether the court of appeals erred in finding, in an ongoing underground pollution migration case, that applicable waivers of governmental immunity could not be applied retroactively to allegedly "past" pollution—even though the causes of action at issue accrued nearly forty years after passage of the immunity waiver statute and included "continuing" tort causes of action.
2. Whether the court of appeals erred in holding that the Colorado Governmental Immunity Act would not be applied retroactively to municipality-generated toxic contamination, while still granting governmental immunity to the municipality based on the assumption that there was pre-CGIA governmental immunity, without analyzing the issue.
3. Whether the court of appeals erred in finding that the Colorado Governmental Immunity Act's waiver provision for dangerous conditions of a public building did not cover claims for liability against a municipality for asbestos release because it found that the "demolition" of a public building was not encompassed in the terms "constructing" or "maintaining."

¶4　With respect to Smokebrush's claims regarding the coal tar contamination, we conclude that under the plain language of section 24-10-106(1)(f), the City has waived its immunity for such claims. Specifically, Smokebrush has established that (1) the coal gasification plant that generated the coal tar contamination at issue was a public gas facility and (2) Smokebrush's claimed injuries from the coal tar contamination resulted from the operation and maintenance of that gas facility.

¶5　Accordingly, we affirm the portion of the division's judgment requiring the dismissal of Smokebrush's asbestos-related claims but reverse the portion of the judgment requiring the dismissal of Smokebrush's coal tar-related claims.

## I. Background and Procedural History

¶6　From approximately 1890 to 1925, private entities operated a coal gasification plant in Colorado Springs. As pertinent here, coal gasification produced gas from coal through combustion, and the gas thus produced was generally used for street lighting.

¶7　In 1925, the City of Colorado Springs acquired the property and continued to operate the plant until 1931, when it converted the facility to natural gas. The coal gasification activities produced an environmentally harmful byproduct known as coal tar, which contained potentially hazardous substances that contaminated the soils on the City's property.

¶8　After a period of use as a natural gas plant, the facility sat idle until the City gradually dismantled it in the 1950s and 1960s. The City later built an office building for its Gas Department (the "Gas Admin Building"), along with one or two other

structures used by other City departments, on the site. The Gas Admin Building served administrative functions and was not used to produce or distribute gas.

¶9 By 2009, the buildings on the property were no longer in use, and in late 2012, the City contracted with Hudspeth and Associates to demolish the remaining structures and convert the entire site to an asphalt parking lot. Demolition of these structures began in 2013 and included an asbestos abatement plan.

¶10 In March 2013, Smokebrush filed a complaint against the City and Hudspeth, alleging that the demolition activities "permitted the airborne migration of soils containing asbestos, heavy metals, and other toxic substances onto [Smokebrush's] property," causing health problems for occupants of the wellness center. The complaint asserted several claims, including negligence, strict liability, trespass, nuisance, and negligence per se. Although the complaint did not expressly mention the historical coal gasification operations on the property or allege injury from the subsurface migration of coal tar contaminants, it generally alleged that "[a]sbestos, heavy metals and other contaminants from the Gas and Warehouse Site have physically intruded onto [Smokebrush's] property."

¶11 The City moved to dismiss Smokebrush's complaint for lack of jurisdiction, arguing that it was immune from suit under the CGIA. Smokebrush responded that the City had waived immunity pursuant to several sections of the CGIA and also asserted, apparently for the first time, that it was injured by the migration of a subsurface plume of coal tar pollutants from the coal gasification plant that had operated on the site.

¶12 Specifically, Smokebrush argued that the City had waived governmental immunity under section 24-10-106(1)(c)'s dangerous condition of a public building exception because the City had negligently constructed and maintained the entire site of the former Gas Admin Building. Smokebrush claimed that the entire site was a "public facility" under the CGIA and that the site contained levels of asbestos and coal tar pollutants that posed an unreasonable risk to public health and safety. Smokebrush further asserted that the City had caused the release of contaminants when it demolished the remaining buildings on the site to construct a parking lot.

¶13 Smokebrush also argued that the City had waived immunity under section 24-10-106(1)(f)'s public gas facility exception. As pertinent here, Smokebrush contended that the site that housed the Gas Admin Building was a "gas facility" because that site had previously been used to provide gas fuel to the public and that the coal tar contamination at issue resulted from the operation and maintenance of this gas facility.

¶14 The City's motion proceeded to a hearing pursuant to Trinity Broadcasting of Denver, Inc. v. City of Westminster, 848 P.2d 916, 924–27 (Colo. 1993). Thereafter, the district court issued a comprehensive order denying the City's motion to dismiss. In this order, the court agreed with Smokebrush that the City had waived governmental immunity for the asbestos and coal tar pollution claims under both the dangerous condition of a public building and the public gas facility exceptions set forth in sections 24-10-106(1)(c) and -106(1)(f). Notably, the court also found—and at least for purposes of the City's motion to dismiss, no party appears to dispute—that Smokebrush first discovered the migration of the coal tar contamination in approximately 2012. Thus, the

7

court concluded that "the Plaintiffs' claims for relief did not accrue until some forty years after the City had waived governmental immunity" under the CGIA.

¶15 The City appealed, and a division of the court of appeals reversed, concluding that the City had <u>not</u> waived immunity under the CGIA. <u>Smokebrush Found.</u>, ¶¶ 2, 17–18, 38. As pertinent here, the division concluded that the City had not waived governmental immunity with respect to the alleged subsurface coal tar contamination because such contamination stemmed from coal gas operations in the 1920s and 1930s (i.e., long before the CGIA was enacted), and nothing in the CGIA states that the waiver provisions apply retroactively. <u>Id.</u> at ¶¶ 17–18. The division likewise concluded that the City had not waived immunity for injuries resulting from the alleged airborne asbestos contamination. <u>Id.</u> at ¶¶ 25–26, 33–36. With respect to these claims, the division reasoned that the public gas facility exception did not apply because no gas collection, production, warehousing, or distribution occurred on the property after the 1930s, and the Gas Admin Building, which was built in the 1960s or 1970s (after the original plant was dismantled) was never operated as a "gas facility" within the meaning of section 24-10-106(1)(f). <u>Id.</u> at ¶ 25. Instead, it was used exclusively for administrative purposes that were, at most, ancillary to the distribution or production of gas. <u>Id.</u> at ¶¶ 25–26. Similarly, the waiver of immunity for a "dangerous condition of any public building" did not apply because the City was not "constructing or maintaining" the Gas Admin Building when it permanently demolished the building, thereby allegedly releasing asbestos and other contaminants. <u>Id.</u> at ¶¶ 33–36.

¶16 We subsequently granted Smokebrush's petition for certiorari.

8

## II. Standard of Review

¶17 Questions of governmental immunity implicate the court's subject matter jurisdiction and are determined in accordance with C.R.C.P. 12(b)(1). St. Vrain Valley Sch. Dist. RE-1J v. Loveland, 2017 CO 54, ¶ 10, 395 P.3d 751, 754. When the facts are undisputed and the only issue is one of statutory interpretation, we review the district court's ruling de novo. Id.

¶18 As with any exercise in statutory interpretation, our focus is on legislative intent. Id. at ¶ 11, 395 P.3d at 754. To determine legislative intent, we construe the statute as a whole, giving consistent, harmonious, and sensible effect to all of its parts. Id. In doing so, we must respect the legislature's choice of language. See UMB Bank, N.A. v. Landmark Towers Ass'n, 2017 CO 107, ¶ 22, ___ P.3d ___. Accordingly, we do not add or subtract words from a statute. Id. If the statutory language is unambiguous, we give effect to its plain and ordinary meaning and look no further. St. Vrain Valley Sch. Dist., ¶ 11, 395 P.3d at 754.

## III. Analysis

¶19 We begin by discussing the statutory provisions applicable to this case. We then examine Smokebrush's claims for injuries resulting from airborne asbestos contaminants released during the 2013 demolition activities and conclude that the City has not waived immunity for such claims under section 24-10-106(1)(c)'s dangerous condition of a public building exception. Last, we address Smokebrush's claims for injuries resulting from the subsurface migration of coal tar contaminants, which claims accrued after the CGIA's effective date of July 1, 1972. We conclude that the City has

waived governmental immunity for these claims under section 24-10-106(1)(f)'s public gas facility exception.

## A. The CGIA

¶20 Under the CGIA, sovereign immunity generally bars any action against a public entity for injuries that lie in tort or could lie in tort. § 24-10-108, C.R.S. (2017). Section 24-10-106(1), however, provides that governmental immunity from liability is waived in an action for injuries resulting from certain tortious governmental conduct, including certain kinds of negligent acts or omissions by public entities or their employees. § 24-10-106(1)(a)–(i).

¶21 Because sovereign immunity poses a bar to suit, it presents a jurisdictional question. See Trinity Broad., 848 P.2d at 924 (observing that the terms by which a sovereign consents to be sued define the court's jurisdiction to entertain the suit). And because the injured plaintiff must establish that the court has jurisdiction, the plaintiff bears the burden of demonstrating that immunity has been waived. See City of Colo. Springs v. Powell, 48 P.3d 561, 563 (Colo. 2002).

¶22 In determining whether the plaintiff has satisfied this burden, we must keep in mind that governmental immunity under the CGIA derogates Colorado's common law. See Springer v. City & Cty. of Denver, 13 P.3d 794, 798 (Colo. 2000). Accordingly, we must strictly construe the statute's immunity provisions but broadly construe its waiver provisions, in the interest of compensating victims of governmental negligence. See id.

¶23 Two of the CGIA's waiver provisions are at issue in this case. First, Smokebrush asserts that the City has waived immunity for the asbestos-related claims under section

10

24-10-106(1)(c)'s waiver for injuries resulting from "[a] dangerous condition of any public building."[2] Second, Smokebrush contends that the City waived immunity for the coal tar-related claims under both the foregoing "public building" exception and section 14-10-106(1)(f)'s waiver for claimed injuries resulting from "[t]he operation and maintenance of any public . . . gas facility."

¶24 We address each of these contentions in turn.

## B. The Asbestos-Related Claims

¶25 As noted above, Smokebrush alleges that it has been injured by asbestos dust and airborne particulates released during the City's 2013 demolition of the Gas Admin Building and other structures on the City's property. Smokebrush contends that immunity is waived for these injuries under section 24-10-106(1)(c), which provides that a public entity waives governmental immunity for injuries resulting from a "dangerous condition of any public building."

¶26 The CGIA defines a "dangerous condition" as:

> either a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of the public entity or public employee in constructing or maintaining such facility.

---

[2] Smokebrush also contends that the alleged asbestos contamination falls under section 24-10-106(1)(f)'s public gas facility exception. The division below, however, rejected this argument, Smokebrush did not contest that ruling in its petition for certiorari, and we did not grant certiorari on the question. Accordingly, we decline to address it.

§ 24-10-103(1.3) (emphasis added). Notably, "[a] dangerous condition shall not exist solely because the design of any facility is inadequate." Id.

¶27 The CGIA does not define "constructing" or "construction." See § 24-10-103. The ordinary meaning of the verb "construct," however, is "to form, make, or create by combining parts or elements." Construct, Webster's Third New International Dictionary (2002). Similarly, "construction" is defined to include "the act of putting parts together to form a complete integrated object." Construction, Webster's Third New International Dictionary (2002). And we have observed that "constructing" not only includes the original construction of a facility "but also encompasses permanent or temporary alterations to the facility made during its ensuing lifetime in service to the public." Padilla ex rel. Padilla v. Sch. Dist. No. 1, 25 P.3d 1176, 1182 (Colo. 2001).

¶28 The CGIA defines "maintenance" as "the act or omission of a public entity or public employee in keeping a facility in the same general state of repair or efficiency as initially constructed or in preserving a facility from decline or failure." § 24-10-103(2.5). "Maintenance" encompasses "ongoing repair and upkeep of the facility as it is put to the original, additional, or different uses than originally constructed" and includes keeping the facility in a state of repair, efficiency, or validity. Padilla, 25 P.3d at 1182 & n.4. "Maintenance," however, does not include "any duty to upgrade, modernize, modify, or improve the design or construction of a facility." § 24-10-103(2.5).

¶29 Applying the foregoing provisions here, we agree with the division below that the City has not waived its immunity under section 24-10-106(1)(c) for the injuries purportedly resulting from airborne asbestos contaminants released during the 2013

12

demolition activities. As noted above, the CGIA defines a "dangerous condition" as one that is proximately caused by the negligent act or omission of the public entity in constructing or maintaining a facility. § 24-10-103(1.3). In our view, demolishing a building in its entirety, as occurred here, is the opposite of "constructing" it. See Demolish, Webster's Third New International Dictionary (2002) (defining "demolish" to mean "to pull or tear down (as a building)" and "to break to pieces or apart"). Similarly, the complete and permanent demolition of a building serves the opposite purpose of "maintenance" as defined by the statute (i.e., to keep the facility in the same general state of repair or efficiency as initially constructed or to preserve a facility from decline or failure). See § 24-10-103(2.5).

¶30 We are not persuaded otherwise by Smokebrush's contention that the asbestos removal conducted during the demolition amounted to "alterations" during the building's "lifetime in service to the public" and thus constituted "construction" or "maintenance" within the meaning of the CGIA. See Padilla, 25 P.3d at 1182. Even before the demolition occurred here, the Gas Admin Building's lifetime in service to the public had ended. And to the extent that Smokebrush contends that the demolition here occurred as part of the construction of a parking lot, a stand-alone parking lot is not a "public building," and thus, the dangerous condition of a public building exception would not apply to its construction.

¶31 Our conclusion does not mean that demolition work in a public building is never part of "construction" or "maintenance" for purposes of section 24-10-106(1)(c). As the division below recognized, under circumstances not at issue here, the "construction" or

13

"maintenance" of a building could involve some demolition work. Here, however, the buildings on the City's property were completely razed—they ceased to exist and were not replaced.

¶32 Accordingly, the alleged dangerous condition—the airborne asbestos—was not proximately caused by any negligent act or omission in "constructing or maintaining" a public building. As a result, the division correctly concluded that Smokebrush cannot establish that the City has waived immunity under the dangerous condition of a public building exception for the asbestos-related claims.

## C. The Coal Tar-Related Claims

¶33 Finally, we address Smokebrush's claims for injuries resulting from the subsurface migration of coal tar contaminants created by coal gasification operations on the City's property. Because we conclude that the City has waived its immunity for these claims under section 24-10-106(1)(f), which involves injury from the operation and maintenance of a public gas facility, we need not address Smokebrush's alternative arguments.

¶34 Section 24-10-106(1)(f) provides that a public entity waives immunity in actions for injuries resulting from "[t]he operation and maintenance of any public . . . gas facility." § 24-10-106(1)(f).

¶35 The CGIA defines "operation" as "the act or omission of a public entity or public employee in the exercise and performance of the powers, duties, and functions vested in them by law with respect to the purposes of any public hospital, jail, or public water, gas, sanitation, power, or swimming facility." § 24-10-103(3)(a). Like the above-noted

14

definition of "maintenance," "operation" does not include any duty to upgrade, modernize, modify, or improve the design or construction of a facility.  Id.

¶36    The CGIA does not define "public gas facility."  It does, however, define "public sanitation facility" as "structures and related apparatus used in the collection, treatment, or disposition of sewage or industrial wastes of a liquid nature that is operated and maintained by a public entity."  § 24-10-103(5.5).  Similarly, the CGIA defines "public water facility" as "structures and related apparatus used in the collection, treatment, or distribution of water . . . that is operated and maintained by a public entity."  § 24-10-103(5.7).

¶37    Although this court has not yet directly addressed what constitutes a public gas facility for purposes of section 24-10-106(1)(f), in Iilot v. State, 944 P.2d 566, 570 (Colo. App. 1996), a division of the court of appeals concluded that "[b]y placing 'gas facility' in the context of other public utilities, the General Assembly has expressed its intent to restrict the definition of that term to include only facilities that distribute natural gas," as opposed to gasoline.  The division thus rejected the argument that "because underground storage tanks contained gasoline and were used to fuel . . . vehicles, the complex was a 'gas facility' under § 24-10-106(1)(f)."  Id. at 569.  Instead, the division observed that "gas," for purposes of the immunity waiver, referred to "a gaseous fuel distributed to the public primarily for use in heating and illumination."  Id. at 570.

¶38    We agree with this reasoning and thus conclude that the coal gasification plant at issue here was a public gas facility within the meaning of section 24-10-106(1)(f).  That plant indisputably was a public facility, and as noted above, it produced a gaseous fuel

15

distributed to the public primarily for use in illumination (here, street lighting). Accordingly, under the definition noted above, the plant was a public gas facility for purposes of the statute. See Jilot, 944 P.2d at 970.

¶39 We are not persuaded otherwise by the City's contention that even if the gas facility exception were pertinent, under Jilot, that exception is inapplicable because it concerns only natural gas and at all pertinent times, the coal gasification facility at issue produced only synthetic gas. In Jilot, the division did not draw a distinction between natural and synthetic gas. Id. at 569–70. Rather, as noted above, it distinguished "gas," as that term is used in the CGIA's public gas facility exception, from "gasoline." Id. at 570. Specifically, the division defined "gas" as "a gaseous fuel distributed to the public primarily for use in heating and illumination." Id. "Gasoline," in contrast, is "a liquid at normal temperatures and is primarily used in internal combustion engines." Id. It is in this context that the division noted the General Assembly's intent to restrict the definition of "gas facility" to facilities that distribute natural gas. Id.

¶40 In short, although Jilot used the term "natural gas," it did so to distinguish "gas," as used in the CGIA, from "gasoline." Applying the Jilot division's above-quoted definition of "gas," however, makes clear that the synthetic gas produced by the coal gas facility at issue would be a "gas"—and the coal gas facility would be a "gas facility"—within the meaning of section 24-10-106(1)(f).

¶41 The question thus becomes whether the coal tar contamination that was generated through the operation of the coal gasification plant constituted injury from

the operation or maintenance of a public gas facility. Applying the plain language of section 24-10-106(1)(f), we conclude that it did.

¶42　As noted above, section 24-10-106(1)(f) provides that sovereign immunity is waived by a public entity in an action for injuries "resulting from . . . [t]he operation and maintenance of any public . . . gas facility . . . by such public entity." (Emphasis added.) Here, the injury at issue (i.e., the coal tar contamination) indisputably "resulted from" the operation of the coal gas facility. Accordingly, under the plain and unambiguous language of the statute, the waiver applies in this case.

¶43　For several reasons, we are not persuaded otherwise by the City's contention that because the CGIA does not apply retroactively, its waiver provisions cannot be applied to conduct occurring before the CGIA's enactment.

¶44　First, notwithstanding the City's assertions to the contrary, we may not avoid the conclusion dictated by the statute's plain language by adding a condition—namely, that the conduct causing the injury at issue must have occurred after the CGIA's effective date—that the legislature did not choose to enact. See UMB Bank, N.A., ¶ 22 (noting that courts must respect the legislature's choice of language and do not add or subtract words from a statute).

¶45　Second, and in any event, we disagree with the City's premises that the conduct at issue occurred before the CGIA's enactment and that the application of the CGIA's immunity waivers raises a retroactivity question. The parties do not appear to dispute, at least for purposes of the City's motion to dismiss, that the coal tar contaminant plume continued to migrate onto Smokebrush's property—and Smokebrush reasonably did

17

not discover this contamination until—after the CGIA's enactment. In our view, this is the pertinent conduct (and injury) resulting from the operation of the coal gas facility, and in this regard, we believe that our decision in Hoery v. United States, 64 P.3d 214 (Colo. 2003), is instructive.

¶46    In Hoery, the Tenth Circuit certified two questions to us. Id. at 215. The first asked us to decide whether the continued migration of toxic chemicals from the defendant's property, which migration was allegedly caused by the defendant's chemical releases, constituted a continuing trespass or nuisance under Colorado law. Id. The second asked us to decide whether the ongoing presence of those toxic chemicals on the plaintiff's property constituted a continuing trespass or nuisance under Colorado law. Id. We answered both questions in the affirmative. Id.

¶47    In reaching these conclusions, we observed that Colorado recognizes the concepts of continuing trespass and nuisance for those property invasions in which a defendant does not stop or remove continuing, harmful physical conditions that are wrongfully placed on a plaintiff's land. Id. at 220. We then concluded, on the facts there before us, that the property invasions by way of trespass and nuisance were continuing because (1) the pollution remained on the plaintiff's property, and the defendant, which had placed the pollution there, did not remove it; and (2) the pollution continued to migrate onto the plaintiff's property, and the defendant's failure to stop the toxic pollution plume that it created from entering the plaintiff's property constituted a continuing property invasion. Id. at 222.

18

¶48　　Although the City contends that <u>Hoery</u> is not pertinent because that case did not involve the application of the CGIA in the context of a continuing tort claim (it arose in the context of a question regarding the statute of limitations), we are unpersuaded. The City, at least implicitly, concedes that the CGIA applies in this case. Its motion to dismiss was premised on the CGIA, and the pertinent section of its answer brief in this court concluded by citing section 24-10-105, C.R.S. (2017), for the proposition that no public entity is liable for tort actions except as provided in the CGIA. <u>See</u> Answer Br. at 34. Moreover, the City's position appears to be based on the fact that Smokebrush's claims accrued after the CGIA was enacted. Accordingly, statute of limitations principles are pertinent to the question of whether the CGIA applies, and in our view, the same principles apply with respect to the CGIA's waiver provisions. In particular, because the migration of the contaminants at issue was ongoing and continued after the CGIA's enactment, applying the CGIA's immunity waivers would not be a retroactive application of those waivers. Rather, under the principles articulated in <u>Hoery</u>, the waivers would be applied <u>prospectively</u>, namely, to injuries caused by the City <u>after</u> the CGIA's enactment. Indeed, such a conclusion is fully consistent with the CGIA's notice requirement, which requires a claimant to give notice of a claim within 182 days after the date the claimant discovers the injury at issue. § 24-10-109(1), C.R.S. (2017).

¶49　　Third, we perceive no basis for concluding that the City can rely on the CGIA's grant of immunity (because Smokebrush's claims accrued after the CGIA's enactment) but that the CGIA's waiver provisions do not apply because the conduct for which the City is asserting immunity allegedly occurred before the CGIA's enactment. The City

19

cites nothing in the CGIA or in any applicable case law to support such a conclusion. Nor does it cite any applicable statutory or case law to support its determination that the waiver provisions at issue are inapplicable to conduct that took place before the CGIA's enactment, <u>even when, as here, Smokebrush's cause of action did not accrue until after that enactment</u>. The City cannot have it both ways. If it claims the benefit of the CGIA's immunity for the conduct at issue, then it must also accept the burden of the CGIA's waiver provisions.

¶50     In this regard, we are unpersuaded by the City's view that it is entitled to immunity because (1) the CGIA's waiver provisions do not apply retroactively and (2) under pre-CGIA law, the City enjoyed sovereign immunity. As an initial matter, we perceive no basis to mix and match statutory and common law principles, and the City cites no applicable authority supporting such an approach. In any event, in <u>Evans v. Board of County Commissioners</u>, 482 P.2d 968, 972 (Colo. 1971), this court abrogated sovereign immunity for causes of action arising after June 30, 1972. Accordingly, if we are to look to pre-CGIA law, as the City suggests, then the City would not be entitled to immunity from Smokebrush's coal tar-related claims because those claims arose after June 30, 1972, and under pre-CGIA law, sovereign immunity had been abrogated for such claims.

¶51     Finally, as noted above, because the immunity granted by the CGIA derogates Colorado's common law, we must construe its immunity provisions strictly but its waiver provisions broadly. <u>Springer</u>, 13 P.3d at 798. The City's argument, however, asks us to do precisely the opposite.

20

¶52    For all of these reasons, we conclude that the City has waived its immunity from Smokebrush's coal tar-related claims, and we need not address Smokebrush's alternative argument that the dangerous condition of a public building exception also applies to Smokebrush's coal tar-related claims.

## IV. Conclusion

¶53    For these reasons, we conclude that the City has not waived immunity under section 24-10-106(1)(c)'s dangerous condition of a public building exception for Smokebrush's asbestos-related claims. We further conclude, however, that the City has waived immunity under section 24-10-106(1)(f)'s public gas facility exception for Smokebrush's coal tar-related claims.

¶54    Accordingly, we affirm in part and reverse in part the judgment of the court of appeals, and we remand this case to that court with instructions that the case be returned to the district court for the dismissal of Smokebrush's asbestos-related claims and further proceedings on its coal tar-related claims.

**JUSTICE MÁRQUEZ** dissents in part and concurs in part and **JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent in part and concurrence in part.

21

JUSTICE MÁRQUEZ, dissenting in part and concurring in part.

¶55    In my view, the City is immune from suit for Smokebrush's claims regarding the subsurface migration of coal tar contaminants caused by historical coal gasification operations on the City's property prior to 1931. Absent clear legislative intent to the contrary, we must presume that statutes such as the CGIA operate prospectively only. The majority ignores both this maxim and the historical context in which the CGIA was enacted and instead applies a waiver provision of the statute retroactively to subject the City to suit for conduct that occurred decades before the enactment of the CGIA, when the City enjoyed sovereign immunity under common law.

¶56    The majority concludes the City has waived immunity under the "operation . . . of [a] public . . . gas facility" provision in section 24-10-106(1)(f) of the CGIA. Maj. op. ¶ 33. Yet the only "public . . . gas facility" on the property that the City ever operated was dismantled years before the enactment of the CGIA and the waiver of immunity in section 24-10-106(1)(f). The majority purports to avoid retroactive application of the waiver to conduct that predates the statute by reasoning that the "pertinent conduct" at issue is instead the present-day, continued migration of toxic chemicals onto Smokebrush's property. Maj. op. ¶ 45. But characterizing Smokebrush's claim as a continuing trespass does not solve the majority's retroactivity problem. The majority acknowledges that the contamination it identifies stemmed from "the operation of the coal gas facility." Id. Indeed it must, because the statutory waiver on which the majority relies applies only to the actual operation or maintenance of such a facility. If

1

the "pertinent conduct" is simply the continuing migration of preexisting contamination (or perhaps the City's failure to mitigate such contamination), then critically, no applicable CGIA waiver exists for such "conduct." Instead, the only "pertinent conduct" to which the waiver in section 24-10-106(1)(f) could apply in this case is the historical coal gasification operations on the property prior to 1931. Because that activity predates the CGIA, the majority's application of the waiver here is necessarily retroactive. And because section 24-10-106(1)(f) does not manifest clear legislative intent to apply retroactively to waive governmental immunity from suit for conduct that long predates enactment of the CGIA, I respectfully dissent from Part III.C of the majority opinion.

## I.

¶57 The common law doctrine of sovereign immunity, which developed in England, was based on the historical fiction that the king could do no wrong and was free from legal accountability. Over time, the doctrine also became a familiar axiom in American jurisprudence. Bertrand v. Bd. of Cty. Comm'rs, 872 P.2d 223, 225 (Colo. 1994). This court's earliest cases recognizing the doctrine lack significant analysis or discussion, but there is little doubt that they adopted the doctrine of sovereign and governmental immunity[1] as the common law of Colorado. Id. (citing In re Constitutionality of

---

[1] "Sovereign immunity" generally refers to the immunity of the state or federal government; "governmental immunity" more broadly refers to immunity at all levels of government. Bertrand, 872 P.2d at 224 n.1 (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts, § 131, at 1033 (5th ed. 1984)).

Substitute for Senate Bill No. 83, 39 P. 1088, 1088 (Colo. 1895); Cty. Comm'rs v. Bish, 33 P. 184 (Colo. 1893)). In short, prior to 1971, the general common law rule in this state was that governmental entities were immune from suit, although some exceptions existed.[2] See id. at n.3.

¶58 In a trio of cases in 1971, this court abrogated the judicially adopted doctrine by choosing "simply to undo" what it had done and leave the future existence of the doctrine up to the legislature. Colo. Dep't of Trans. v. Brown Grp. Retail, Inc., 182 P.3d 687, 689 (Colo. 2008) (summarizing impact of Evans v. Bd. of Cty. Comm'rs, 482 P.2d 968, 972 (Colo. 1971), Flournoy v. Sch. Dist., 482 P.2d 966 (Colo. 1971), and Proffitt v. State, 482 P.2d 965 (Colo. 1971)); see also Bertrand, 872 P.2d at 226. We made clear that our ruling was "prospective only" and effective "only as to causes of action arising after June 30, 1972." Evans, 482 P.2d at 972. We further made clear that the General Assembly had the authority to restore sovereign immunity and governmental immunity in whole or in part, and that, if it chose the latter, it could place limitations on the actions that may be brought against the state and its subdivisions. Id.; see also Brown Grp. Retail, 182 P.3d at 689.

---

[2] For example, in Malvernia Investment Co. v. City of Trinidad, 229 P.2d 945, 947 (Colo. 1951), this court suggested that a city could be liable for claims arising from its failure to maintain drainage and sewer systems. In Boxberger v. State Highway Department, 250 P.2d 1007, 1008 (Colo. 1952), this court concluded that a plaintiff could maintain an action against the state where he sought to rescind a deed conveying land to the state, and where the suit was not in tort and did not seek to impose liability on the state, or recover money from the state.

3

¶59 The General Assembly responded by enacting Colorado's Governmental Immunity Act. The CGIA legislatively restored governmental immunity, effective July 1, 1972, and carved out "a limited number of exceptions waiving immunity for various governmental acts." Bertrand, 872 P.2d at 226 (citing Ch. 323, sec. 1, §§ 130-11-1 to -17, 1971 Colo. Sess. Laws 1204, 1204–11). In its declaration of policy, the legislature acknowledged that the doctrine of sovereign immunity is inequitable in some instances, but it observed that "unlimited liability could disrupt or make prohibitively expensive the provision of . . . essential public services and functions." § 24-10-102, C.R.S. (2017). It recognized that "taxpayers would ultimately bear the fiscal burdens of unlimited liability," and that "limitations on the liability of public entities and public employees are necessary in order to protect the taxpayers against excessive fiscal burdens." Id. The General Assembly thus declared that "the state, its political subdivisions, and the public employees of such public entities . . . should be liable for their actions . . . only to such an extent and subject to such conditions as are provided by this article," id., and delineated in the Act the limited circumstances in which the state and its political subdivisions consented to be sued by waiving immunity for the government's tortious conduct, see §§ 24-10-103 to -106.

## II.

¶60 With this background in mind, I conclude that the City is immune from suit for alleged injuries resulting from the subsurface migration of coal tar contaminants created by historical coal gasification operations on the City's property prior to 1931. The

4

statutory waiver on which the majority relies applies only to alleged tortious governmental conduct that predates the enactment of the CGIA. However, the CGIA waiver provisions do not manifest clear legislative intent to retroactively waive the governmental immunity that existed under common law for negligent acts or omissions that predate the CGIA.

¶61 We made clear in Evans that our decision to abrogate the doctrine of sovereign immunity applied "prospective[ly] only," and that it was "effective only as to causes of action arising after June 30, 1972." 482 P.2d at 972. Nothing in Evans altered the sovereign and governmental immunity that existed under common law prior to that decision. Thus, in passing the CGIA, effective July 1, 1972, the General Assembly had no need to address or disturb the sovereign and governmental immunity that existed under Colorado common law prior to that date. Instead, the legislature responded to the purely prospective effect of Evans by enacting the CGIA to establish statutory sovereign and governmental immunity going forward and to delineate the limited circumstances in which the new, statutory sovereign immunity would be waived. See § 24-10-102 ("The general assembly . . . recognizes that the supreme court has abrogated the doctrine of sovereign immunity effective July 1, 1972, and that thereafter the doctrine shall be recognized only to such extent as may be provided by statute.") (emphasis added). Thus, both the historical context in which the CGIA was enacted and the legislature's declaration of policy reflect the General Assembly's intent to give

5

the Act (including its limited waivers of immunity for certain tortious governmental conduct) purely prospective effect.

¶62    Moreover, in Colorado, we presume that, absent legislative intent to the contrary, statutes such as the CGIA operate prospectively. § 2-4-202, C.R.S. (2017) ("A statute is presumed to be prospective in its operation."); City of Colo. Springs v. Powell, 156 P.3d 461, 464 (Colo. 2007) ("Powell II"); Ficarra v. Dep't of Regulatory Agencies, Div. of Ins., 849 P.2d 6, 13 (Colo. 1993) (collecting cases). "A prospective statute, as its name implies, operates on conduct, events, and circumstances that occur after its enactment." 2 Norman J. Singer, Sutherland Statutory Construction § 41:1 (7th ed.). Accordingly, unless contrary intent is shown, we presume that "legislation shall apply only to those transactions occurring after it takes effect." Powell II, 156 P.3d at 464; see also Ficarra, 849 P.2d at 14 ("[C]lear legislative intent must appear from the statute in order to overcome the presumption that legislation is presumed to have a prospective effect."). In this context, the relevant "conduct," "event," or "transaction" is the government's tort. In other words, we must presume the General Assembly intended both the statutory sovereign immunity and the limited waivers of that immunity to apply only to torts committed after the effective date of the Act.

¶63    For example, under section 24-10-106(1)(f), a public entity waives sovereign immunity "in an action for injuries resulting from" the "operation and maintenance of any public . . . gas facility." Unsurprisingly, this waiver addresses tortious governmental conduct, specifically, negligent "act[s] or omission[s]" in the maintenance

6

or operation of a public gas facility.  See § 24-10-103(2.5) (defining "maintenance"); § 24-10-103(3) (defining "operation").  Thus, if the government commits negligent acts or omissions in the maintenance or operation of a public gas facility after the effective date of the Act, and that negligent conduct results in injury, section 24-10-106(1)(f) waives governmental immunity for that tort.

¶64     But nothing in the CGIA establishes clear legislative intent to waive immunity retroactively for tortious governmental conduct that predated the Act itself — conduct for which the government was immune under common law.  Given this court's purely prospective ruling in Evans, the legislature had no need to address immunity for tortious conduct that predated that decision.  Evans left untouched the sovereign and governmental immunity that existed under common law prior to July 1, 1972.

**III.**

¶65     Here, the majority applies the "public . . . gas facility" provision in section 24-10-106(1)(f) to alleged tortious conduct that long predates the CGIA — conduct for which the City contends it was immune at the time under common law. [3]  The majority

---

[3] The majority suggests the City "cannot have it both ways" and "claim[] the benefit of the CGIA's immunity" yet avoid the waiver provisions.  Maj. op. ¶ 49.  In so doing, the majority mistakenly assumes that the City relies on CGIA immunity, instead of common law sovereign immunity, in defending against Smokebrush's coal tar claims. See Ans. Br. at 32–33 (arguing that conduct related to the coal tar claims occurred before adoption of the CGIA, when common law sovereign immunity would have precluded suit).  The majority suggests that the City implicitly conceded that the CGIA applies in this case because its motion to dismiss was premised on the CGIA.  See maj. op., ¶ 48.  I disagree.  When the City filed its motion, Smokebrush's allegations were limited to the demolition activities in 2013.  As the majority notes, Smokebrush raised allegations

acknowledges that the coal tar contamination that has migrated onto Smokebrush's property was caused by the City's coal gasification operations prior to 1931. Importantly, the majority relies on the "public . . . gas facility" provision in section 24-10-106(1)(f) to hold that the City has waived immunity. But the entire time the City was operating the coal gasification plant, it enjoyed common law governmental immunity from suit. The CGIA and its accompanying waivers of immunity did not yet exist. And nothing in the CGIA manifests clear legislative intent to waive governmental immunity for torts committed before the enactment of the CGIA. As noted above, the legislative declaration of policy in section 24-10-102 reflects that the General Assembly enacted the CGIA only in response to the purely prospective effect of this court's decision in <u>Evans</u>. There is no reason to believe that the legislature intended to go further than necessary to address <u>Evans</u> and also alter the common law immunity that <u>Evans</u> left untouched.

¶66     Importantly, the majority does not identify any post-CGIA conduct by the City to which the "public . . . gas facility" waiver of immunity applies. Even assuming the original coal gasification plant would meet the definition of a "public . . . gas facility," by the time the CGIA was enacted in 1972, the City had long since dismantled and replaced the plant with other buildings that were not involved in the production,

concerning the historical coal gasification operations for the first time in its response to the City's motion to dismiss. <u>Id.</u> at ¶ 11. Thus, when the City filed its motion, it had no reason to address common law sovereign immunity because Smokebrush had given no indication that its claims were based, in part, on pre-CGIA conduct.

8

storage, or distribution of gas. Put differently, Smokebrush has not shown that the City has "operated" or "maintained" a gas facility since the enactment of the CGIA for which it has waived immunity.

¶67 The majority seeks to avoid this problem by suggesting that the "pertinent conduct" here is not, in fact, the historical operation or maintenance of the gas facility, but instead the present-day continuing underground migration of contaminants from the City's property onto Smokebrush's neighboring property. See maj. op. ¶ 45. But if continuing trespass is the tort at issue, there is no applicable waiver of immunity in the CGIA for such "conduct." Section 24-10-106(1) does not waive immunity for the continuing migration of preexisting contamination. Nor does it waive immunity for a public entity's failure to mitigate such preexisting contamination. Thus, I disagree with the majority's misplaced reliance on the concept of a "continuing tort" and this court's decision in Hoery v. United States, 64 P.3d 214 (Colo. 2003). Maj. op. ¶¶ 45–48.

¶68 Hoery does not bear the weight the majority places on it. In that case, the plaintiff sued the United States under the Federal Tort Claims Act ("FTCA"), claiming that the United States negligently released toxic chemicals from Lowry Air Force Base into the ground, which contaminated his nearby residential property. Hoery, 64 P.3d at 215–16. The plaintiff brought his claims for trespass and nuisance in 1998, although he knew or should have known that his property was contaminated in 1995. Id. at 216–17. The trial court dismissed his claims as untimely under the FTCA's two-year statute of limitations. Id. We considered whether the continuing migration and ongoing

9

presence of toxic pollution on a plaintiff's property constituted a continuing trespass, even though the condition causing that pollution had ceased. Id. at 220. We held that the United States' "failure . . . to remove the pollution from [the plaintiff's] property that it wrongfully placed there" constituted a continuing trespass and nuisance under Colorado law that created a new cause of action each day the property invasion continued, rather than claims for permanent trespass or nuisance for which the statute of limitations began to run upon discovery of the claim. Id. at 222–23.

¶69 Hoery was fundamentally a statute of limitations case. Its analysis is not dispositive of the CGIA waiver issue here. Indeed, governmental immunity was not an issue in that case because under the FTCA, the United States was liable "in the same manner and to the same extent as a private individual under like circumstances." Id. at 217 (quoting 28 U.S.C. § 2674 (2012)). In short, whether Smokebrush's claims are characterized as "continuing torts," "permanent torts," or some other kind of tort, see id. at 218–20, they are tort claims for which the City is immune from suit unless Smokebrush can establish that immunity has been waived. And Smokebrush has failed to establish that the City has waived its immunity under either the common law or the CGIA.

¶70 The majority's holding today greatly expands the temporal reach of the CGIA waivers of immunity, and does so, in my view, contrary to clear legislative intent. In passing the Act, the General Assembly recognized that "unlimited liability could disrupt or make prohibitively expensive the provision of . . . essential public services

10

and functions," and that the taxpayers would ultimately bear the fiscal burdens of such unlimited liability. See § 24-10-102. The majority's holding permitting retroactive application of the CGIA waivers of immunity now exposes public entities to suit for torts that occurred long before the enactment of the CGIA. Today's holding, I fear, will lead to tort liability that could impose significant and uncertain financial burdens on state and local government, contrary to the General Assembly's declaration of policy.

¶71 In sum, I discern no clear legislative intent to apply the waivers of immunity in the CGIA retroactively to conduct that predates the Act. Ficarra, 849 P.2d at 14 ("[C]lear legislative intent must appear from the statute in order to overcome the presumption that legislation is presumed to have a prospective effect."). Because I believe the majority's holding is at odds with the legislature's purpose in enacting the CGIA and may lead to the unlimited liability and taxpayer burden the legislature expressly sought to avoid, I respectfully dissent from Part III.C of the majority's opinion.

I am authorized to state that JUSTICE COATS and JUSTICE BOATRIGHT join in this dissent in part and concurrence in part.