Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 21, 2018

**2018 CO 37**

**No. 16SC851, City & Cty. of Denver v. Dennis ex. rel. Heyboer—Colorado Governmental Immunity Act—Sovereign Immunity.**

In this case, the supreme court reviews whether the City and County of Denver waived its immunity under the Colorado Governmental Immunity Act ("CGIA"). After a motorcycle accident, the plaintiff sued the City and County of Denver, and alleged that Denver had waived its immunity under the CGIA because the road on which the plaintiff was traveling constituted a dangerous condition that physically interfered with the movement of traffic. To prove a dangerous condition, a plaintiff must prove four elements, one of which is that the road constituted an unreasonable risk to the health and safety of the public.

The supreme court defines "unreasonable risk" in this context as a road condition that creates a chance of injury, damage, or loss which exceeds the bounds of reason. This determination will be fact specific, and in this case, the road did not create an unreasonable risk to the health and safety of the public. Nor did the condition of the road physically interfere with the movement of traffic. Accordingly, the supreme court reverses the court of appeals judgment to the contrary.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 37

**Supreme Court Case No. 16SC851**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA1572

**Petitioner:**

The City and County of Denver,

v.

**Respondent:**

Sean Dennis, as conservator and on behalf of Doreen Heyboer.

**Judgment Reversed**
*en banc*
May 21, 2018

**Attorneys for Petitioner:**
Denver City Attorney's Office
Wendy J. Shea, Assistant City Attorney
Jamesy C. Owen, Assistant City Attorney
  *Denver, Colorado*

**Attorneys for Respondent:**
Bachus & Schanker, LLC
David Krivit
Scot C. Kreider
  *Denver, Colorado*

**Attorneys for Amici Curiae Colorado Intergovernmental Risk Sharing Agency and Colorado Municipal League:**
Senter Goldfarb & Rice, LLC
Eric M. Ziporin
  *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
James M. Croshal
Mickey W. Smith
  *Pueblo, Colorado*

**Attorneys for Amicus Curiae State of Colorado:**
Office of the Colorado Attorney General
Kathleen L. Spalding
William V. Allen
  *Denver, Colorado*

**CHIEF JUSTICE RICE** delivered the Opinion of the Court.
**JUSTICE GABRIEL** dissents, and **JUSTICE HOOD** and **JUSTICE HART** join in the dissent.

¶1 As a passenger on a motorcycle, Doreen Heyboer was involved in an accident with an automobile in Denver and suffered catastrophic injuries. As a result of her injuries, her conservator sued the City and County of Denver, alleging that the street's deteriorated condition contributed to the accident. Denver responded by asserting its immunity under the Colorado Governmental Immunity Act ("CGIA"). Heyboer argues that Denver waived its immunity because the road was a dangerous condition that physically interfered with the movement of traffic, and thus, her suit fits an express exception found in the CGIA. § 24-10-106(1)(d)(I), C.R.S. (2017). Here, we review the court of appeals' determination that Heyboer established a waiver of immunity.[1]

¶2 We hold that Heyboer's evidence did not establish a waiver of immunity. Specifically, we hold that her evidence did not establish that the road constituted an

---

[1] We granted certiorari on the following three issues:

1. Whether the court of appeals' holding that a public road constitutes an "unreasonable risk to the health or safety of the public" simply because it is not in the same state of repair or efficiency as initially constructed improperly removes respondent's burden of proving the unreasonable risk and causation elements contained within the definition of a "dangerous condition" under the CGIA.

2. Whether the court of appeals erred by failing to require respondent to prove that the alleged state of disrepair of the road, itself, constituted a dangerous condition that physically interfered with the movement of traffic pursuant to section 24-10-106(1)(d)(I), C.R.S. (2016).

3. Whether the court of appeals erred by holding as a matter of law that a municipality's failure to maintain a public road in its "same state of repair or efficiency as initially constructed" constitutes an "unreasonable risk to the health or safety of the public" pursuant to the definition of a "dangerous condition" set forth in section 24-10-103(1.3), C.R.S. (2016), of the Colorado Governmental Immunity Act ("CGIA").

unreasonable risk of harm to the health and safety of the public, nor did her evidence establish that the road physically interfered with the movement of traffic. § 24-10-106(1)(d)(I); § 24-10-103(1.3), C.R.S. (2017). Accordingly, Denver retained its immunity under the CGIA, and we reverse the judgment of the court of appeals.

## I. Facts and Procedural History

¶3 On September 20, 2013, Heyboer was a passenger on a motorcycle driven by Michael Veres. As they traveled eastbound on Mississippi Avenue, toward its intersection with Broadway, a westbound driver suddenly and unexpectedly turned left onto southbound Broadway, effectively cutting off Veres and Heyboer as they entered the intersection. Veres attempted to brake, but was unable to stop in time and collided with the rear panel of the turning car. Heyboer was flung from the motorcycle, landed on the pavement, and suffered permanent brain injuries. The driver of the car was cited for careless driving and failure to yield the right-of-way.

¶4 Through her conservator, Heyboer timely sued the City and County of Denver, alleging one count of negligence and one count of premise liability under section 13-21-115, C.R.S. (2017).[2] Denver asserted that it was immune from suit under the CGIA and filed a motion to dismiss pursuant to C.R.C.P. 12(b)(1).

¶5 Pursuant to Trinity Broad. Corp. v City of Westminster, 848 P.2d 916 (Colo. 1993), the district court held a hearing to decide the immunity question. At the hearing, Heyboer called William Kennedy, Denver's Pavement Engineer, to the stand. He

---

[2] Heyboer also sued Veres, but the parties settled out of court. Heyboer settled with the driver of the other car without litigation.

4

testified that Denver would immediately repair a road if there was a condition on the road—such as a pothole, sinkhole, or lip—that might cause damage to a driver's car or force a driver to make an unnatural movement of their vehicle to avoid the obstacle. In order to determine when roads need repair, Denver uses a Pavement Condition Index (PCI). The PCI is a complex system which rates roads as "excellent," "good," "fair," "poor," or "very poor." These ratings are not related to how safe or dangerous a road is, but rather assist Denver in determining maintenance-and-repair needs and priorities. While Denver's internal analysis rated the Mississippi–Broadway intersection as "very poor," Kennedy testified that eight days before the accident, in response to a 311 complaint,[3] he inspected the road and determined that while it was "indeed cracked, worn, and somewhat rutted, it did not require immediate repair." Kennedy further testified that the intersection was "dangerous," but not "dangerous enough" to warrant immediate repairs.

¶6     The district court, in a written order, found that Denver was immune from suit and dismissed the case. Specifically, the district court found that Heyboer "produced no evidence, either through a witness or an exhibit, that this dangerous condition posed 'an unreasonable risk to the health or safety of the public' as required by section 24-10-103(1.3)."

¶7     In a unanimous opinion, the court of appeals reversed. Dennis ex rel. Heyboer v. City & Cty. of Denver, 2016 COA 140, ¶ 5, __ P.3d__. The court of appeals held that the

---

[3] 311 is the non-emergency contact number which citizens can use to contact Denver regarding municipal facilities and services.

district court "clearly erred in its factual finding that the record contained no evidence of an unreasonable risk to the health or safety of the public." Id. at ¶ 4. The court of appeals determined that "a plaintiff satisfies his or her burden of proving an 'unreasonable risk to the health or safety of the public' under section 24-10-103(1.3) when he or she shows that a governmental entity failed to restore a damaged road to its 'same state of efficiency or repair as initially constructed.'" Id. at ¶ 36. Here, because the evidence showed the road was not maintained in the same state of repair or efficiency as initially constructed, the court of appeals held that the road constituted an unreasonable risk to the health or safety of the public. Id. at ¶¶ 39–40. Further, the court concluded that Heyboer's evidence established that the road constituted a dangerous condition that interfered with the movement of traffic, meaning Denver waived its immunity under the CGIA. Id.

¶8    We granted certiorari and now reverse.

## II. Standard of Review

¶9    This case was dismissed on a C.R.C.P. 12(b)(1) motion for lack of subject matter jurisdiction. Heyboer argues that immunity questions which implicate tort concepts should be judged by a more lenient standard, such as a C.R.C.P. 12(b)(5) standard[4] or a summary judgment standard.[5] We disagree. C.R.C.P. 12(b)(1) is the correct standard of

---

[4] Under this standard, the court would accept every factual allegation in Heyboer's complaint as true, and view the facts "in the light most favorable to [Heyboer]." Norton v. Rocky Mountain Planned Parenthood, Inc., 2018 CO 3, ¶ 7, 409 P.3d 331, 334.

[5] Under this standard, the court would grant Heyboer "the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts and resolve all doubts against [Denver]." Hardegger v. Clark, 2017 CO 96, ¶ 13, 403 P.3d 176, 180.

review because whether the government is immune from suit is a jurisdictional question, and our case law requires that the district court make factual findings about its ability to hear the case.

¶10 The CGIA requires that once a public entity raises the defense of sovereign immunity, the court must immediately suspend discovery unrelated to sovereign immunity and decide that issue. § 24-10-108, C.R.S. (2017). Sovereign immunity must be dealt with at the earliest possible stage because "[t]he sovereign cannot be forced to trial if a jurisdictional prerequisite has not been met." Trinity, 848 P.2d at 924. Because the CGIA protects the government from suit, the district court must necessarily make factual findings to ensure that the court has jurisdiction to hear the case. Trinity, 848 P.2d at 924. Accordingly, a C.R.C.P. 12(b)(1) standard of review is appropriate.

¶11 The burden of proof is on the plaintiff to prove the government has waived its immunity, but this burden is relatively lenient, as the plaintiff is afforded the reasonable inferences from her undisputed evidence. Tidwell ex rel. Tidwell v. City & Cty. of Denver, 83 P.3d 75, 85-86 (Colo. 2003). When the facts are disputed, the court must begin by making a factual finding. Id. If the court determines that the plaintiff's allegations are true, then it should award the plaintiff the reasonable inferences from her evidence. Id. at 85. However, because Trinity hearings are limited in nature, and because tort concepts are naturally subjective, the district court should not fully resolve the issue of whether the government has committed negligence; rather, the court should only satisfy itself that it has the ability to hear the case. Id. at 86; see also Swieckowski by Swieckowski v. City of Fort Collins, 934 P.2d 1380, 1384 (Colo. 1997) ("[W]e

7

emphasize that we do not address issues of negligence or causation, which are matters properly resolved by the trier of fact.").

¶12 We will uphold the factual determinations of the district court unless those determinations are clearly erroneous. Medina v. State, 35 P.3d 443, 452 (Colo. 2001). Once the questions of fact are resolved, we review questions of governmental immunity de novo. Id. at 452–53. When interpreting the statute, our focus is on legislative intent, and we construe the statute as a whole, giving consistent, harmonious, and sensible effect to all of its parts. St. Vrain Valley Sch. Dist. RE-1J v. Loveland, 2017 CO 54, ¶ 11, 395 P.3d 751, 754. We do not add or subtract words from the statute, and if the language is unambiguous, we "give effect to its plain and ordinary meaning and look no further." Smokebrush Found. v. City of Colo. Springs, 2018 CO 10, ¶ 18, 410 P.3d 1236, 1240.

### III. Analysis

¶13 Our analysis proceeds in the following way: First, we examine the "dangerous condition" prong of section 24-10-106(1)(d)(I), focusing on whether the road constituted an unreasonable risk to the health and safety of the public. We explain why we cannot affirm the court of appeals' definition of "unreasonable risk," and then define "unreasonable risk." Applying that definition, we conclude that the road in this case did not constitute an unreasonable risk. Second, we examine the "physical interference with traffic" prong of section 24-10-106(1)(d)(I) and hold that the road did not physically interfere with the movement of traffic.

8

## A. CGIA Background

¶14 The General Assembly enacted the CGIA in response to a trio of 1971 cases in which we held that common law sovereign immunity no longer applied in Colorado. Springer v. City & Cty. of Denver, 13 P.3d 794, 798 (Colo. 2000). The CGIA gives public entities immunity for injuries that lie in tort or could lie in tort. § 24-10-108, C.R.S. (2017). However, the CGIA waives immunity in certain circumstances. E.g., §§ 24-10-104 to -106.3, C.R.S. (2017). Because the CGIA derogates common law, we construe its waivers of immunity broadly. Corsentino v. Cordova, 4 P.3d 1082, 1086 (Colo. 2000).

¶15 The CGIA waives a governmental entity's immunity when "a dangerous condition of a . . . road, or street . . . physically interferes with the movement of traffic." § 24-10-106(1)(d)(I). Thus, in order to overcome Denver's motion to dismiss, Heyboer has the burden of proving to the district court that the road itself was "a dangerous condition." The CGIA defines "dangerous condition" as:

> a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of the public entity or public employee in constructing or maintaining such facility.

§ 24-10-103(1.3). So, Heyboer must prove (1) the physical condition of the street, (2) constituted an unreasonable risk to the health or safety of the public, (3) Denver knew or should have known of the risk, and (4) Heyboer's injury was proximately caused by Denver's negligent omission in maintaining the street. See St. Vrain, ¶ 16,

9

395 P.3d at 755 (enumerating the four factors that a plaintiff must generally prove to show a dangerous condition). Additionally, Heyboer had to demonstrate that the dangerous condition interfered with the movement of traffic. § 24-10-106(1)(d)(I).

¶16 Denver argues that Heyboer failed to demonstrate either element of section 24-10-106(1)(d)(I). First, Denver argues that the road did not present an unreasonable risk to the health and safety of the public, so the road did not present a dangerous condition. Second, Denver argues that the road's condition did not physically interfere with the movement of traffic. However, before we address these arguments, we first examine the court of appeals decision.

## B. The Court of Appeals Erred

¶17 The court of appeals held that "[t]he failure to keep a road in the same general state of repair or efficiency as it was initially constructed . . . constitutes an unreasonable risk" and that a plaintiff "satisfies his or her burden of proving an 'unreasonable risk to the health or safety of the public' under [section] 24-10-103(1.3) when he or she shows that a governmental entity failed to restore a damaged road to its 'same state of efficiency or repair as initially constructed.'" Dennis, ¶ 36. The court applied its definition and concluded that Denver had, indeed, failed to maintain the road in the same condition as initially constructed, meaning Heyboer had established that the road was an "unreasonable risk" to the public. Id. at ¶ 39.

¶18 The court of appeals' definition of "unreasonable risk" is incorrect for two reasons. First, the court of appeals misread the law. The government's duty to maintain a road is triggered only after the road becomes unreasonably dangerous.

10

Swieckowski, 934 P.2d at 1385 ("[W]hile the government has no duty to improve a roadway, it does have a duty to repair a roadway where the roadway has changed from its original condition and this change poses a danger."). It is only once the road becomes unreasonably risky that the government has a duty to "take the steps necessary to return the road to the same general state of being, repair, or efficiency as initially constructed, but nothing more." Medina, 35 P.3d at 457. Just because a road is not "like new" does not mean it automatically constitutes an unreasonable risk to the health and safety of the public. Many perfectly safe roads are not in the same condition as they were on the day of construction. A road does not automatically constitute an unreasonable risk to the health and safety of the public merely because the government has failed to "keep a road in the same general state of repair or efficiency as it was initially constructed." Dennis, ¶ 36. To the contrary, the CGIA and our prior case law make clear that the government's duty to maintain the road is triggered only once the road has degraded to such an extent that it presents an unreasonable risk to the public. Medina, 35 P.3d at 457; Swieckowski, 934 P.2d at 1385.

¶19    Second, when engaging in statutory construction, we construe statutes to "further the legislative intent represented by the entire statutory scheme" and avoid absurd results. State v. Nieto, 993 P.2d 493, 501 (Colo. 2000). Here, the court of appeals' reading of the statute is at odds with the policy behind the CGIA itself. The CGIA was enacted, in part, to "protect the taxpayers against excessive fiscal burdens" which could arise from "unlimited liability" that the state could incur under tort lawsuits. § 24-10-102, C.R.S. (2017); see also Ceja v. Lemire, 154 P.3d 1064, 1067 (Colo. 2007) ("One

11

of the General Assembly's stated purposes in enacting the CGIA was to limit the liability of public entities and employees . . . ."). However, the court of appeals' reading expands taxpayers' fiscal burdens by creating an impossibly high standard. The court of appeals' reading of the statute would require state and local governments to keep roads like new at all times, or face potential liability in a tort lawsuit because the road constitutes an unreasonable risk to the health and safety of the public. Statewide, the Colorado Department of Transportation ("CDOT") estimates that maintaining mainline roads at this level would cost one billion dollars per year. Brief for Colorado Intergovernmental Risk Sharing Agency et al. as Amicus Curiae Supporting Petitioner, at 6. Further, "restoring Colorado's bridges to 'as constructed' condition would cost an additional seven billion, with $360 million yearly for maintenance." Id. CDOT's yearly budget for fiscal year 2017 is $1.4 billion. Id. Of course, the state could not simultaneously fix every road; some roads would be prioritized and renovated before others. And when a motorist was injured on one of the non-prioritized roads that were awaiting renovation, the government would be potentially liable for not fixing the road. Thus, the taxpayers would be footing both the costs of making roads like new and the costs of potential lawsuits. The CGIA intends to lessen potential burdens on taxpayers; because the court of appeals ignored this policy declaration and expanded the potential burdens on taxpayers, the court of appeals erred. We now turn to the question of what "unreasonable risk" means for purpose of the CGIA.

12

## C. Unreasonable Risk

¶20 Heyboer urges us to analyze "unreasonable risk" the same way that a court would analyze whether, in the tort context, a party owes a duty of care to another party. She argues that the legislature intended for the "essence of the court's inquiry" to be the same as the inquiry a court would undertake for a negligence claim that did not involve governmental immunity. Thus, Heyboer argues that a district court should only dismiss a complaint when "the foreseeability of the risk is so remote in comparison to the magnitude of the burden in guarding against the risk . . . that the defendant had no duty to guard against it as a matter of law."

¶21 We disagree. While one of the purposes of the CGIA is "to permit a person to seek redress for personal injuries caused by a public entity," State v. Moldovan, 842 P.2d 220, 222 (Colo. 1992), the General Assembly did not intend suits against the government to be the same as normal negligence suits, because the CGIA explicitly limits governmental liability: "[Governmental entities] should be liable for their actions and those of their agents only to such an extent and subject to such conditions as are provided by this article." § 24-10-102 (emphasis added). And the CGIA expressly states that after "sovereign immunity has been waived . . . nothing shall be deemed to foreclose the assumption of a duty of care by a public entity or public employee." § 24-10-106.5(1). Thus, the court must decide the sovereign immunity question separate and apart from the duty of care question.

¶22 Further, when we construe statutes, we do not subtract words from the statute. Smokebrush, ¶ 18, 410 P.3d at 1240. Heyboer's reading of the statute excises the word

13

"unreasonable" from the statute. If a plaintiff needed to prove only that the risk was foreseeable, she would not also need to prove that the risk was unreasonable. There are situations when there is a chance the road could cause an injury, or it is foreseeable that the road could cause an injury, but that risk is inherent in driving on a road that has deteriorated from its original condition through use. Put differently, there is a foreseeable risk that the road could cause an injury, but that risk is reasonable. The CGIA requires more than a foreseeable risk of harm; it requires an unreasonable risk of harm. § 24-10-103(1.3).

¶23     Instead, to construe the statute, we look to the plain and ordinary meaning of the words in the statute. Smokebrush, ¶ 18, 410 P.3d at 1240. The CGIA defines "dangerous condition" as a condition that constitutes an "unreasonable risk to the health or safety of the public." § 24-10-103(1.3). To determine the plain and ordinary meaning of words, we may look to the dictionary for assistance. People v. Voth, 2013 CO 61, ¶ 23, 312 P.3d 144, 149. "Unreasonable" in this context means "exceeding the bounds of reason or moderation." Unreasonable, Webster's Third New International Dictionary (unabr. ed. 2002). A risk is "the chance of injury, damage, or loss." Risk, Black's Law Dictionary (10th ed. 2014). The term "unreasonable" modifies the term "risk." Therefore, to prove this element, the plaintiff must prove that the road condition created a chance of injury, damage, or loss which exceeded the bounds of reason. Determining if the road presents an unreasonable risk will necessarily be a fact-specific inquiry; there is no one-size-fits-all rule that encapsulates when a condition will

14

constitute an unreasonable risk to the health and safety of the public. So, we now turn to the facts of this case.

## D. Application

¶24     As the district court stated, the following is undisputed:

- [Heyboer] was injured in the motor vehicle crash which occurred at an intersection in Denver on September 20, 2013;
- Denver is responsible to maintain the road at this intersection; and
- Denver had notice of the condition of the roadway . . . .

At the Trinity hearing, Heyboer and Denver called accident reconstruction experts to testify. The experts disagreed about whether the condition of the road caused the accident. Heyboer called the motorcycle driver to the stand, and he testified that the road may have played some role in his inability to avoid the accident. Denver called the investigating police officer, who testified that the road did not play a role in causing the accident. Thus, there was conflicting testimony on these points, and the district court did not make findings of fact resolving the conflicting testimony. Instead, the district court found that the road did not constitute an unreasonable risk to the health and safety of the public.

¶25     We agree. In this case, it may well be that driving on the road carried some risk—some chance of injury, damage or loss—however, we are not persuaded that the risk was unreasonable. In order for Denver to waive its immunity, the road must have degraded to such an extent that it was unreasonably risky, at which point in time Denver would be under a duty to fix the road by restoring the road to its design stage. Medina, 35 P.3d at 457; Swieckowski, 934 P.2d at 1385. Important to this determination

15

is Kennedy's unrebutted testimony. He testified that when determining if a road posed a risk to the health and safety of the public, he would look for "deep, wide potholes that could catch a tire, or ruts that would cause a vehicle to be redirected" and that those features were not present on this road. True, Kennedy testified that the road was "well worn" and in "very poor condition" at the time of the accident according to the PCI, but one week before this accident, Kennedy inspected the road and found that while it was cracked and rutted, it did not require immediate repair.

¶26 Here, the evidence did not show that the road posed a chance of injury, damage, or loss that exceeded the bounds of reason. The road, while cracked and rutted, did not contain potholes or sinkholes. The road did not contain features which would force a driver to make an emergency maneuver, or any other road characteristics such as a raised pavement lip that could damage a vehicle and lead to an accident. While Heyboer is afforded the inferences of her undisputed evidence, she nevertheless bore the burden of proving that the road constituted an unreasonable risk to the health and safety of the public; she failed to do so. Her evidence showed a deteriorated road, but not a road which was unreasonably risky on which to drive. Thus, Heyboer failed to establish that the road constituted a dangerous condition such that Denver waived its immunity under the CGIA.

¶27 We next examine whether the road's condition physically interfered with the movement of traffic. § 24-10-106(1)(d)(I). In determining that Denver had waived its immunity, the court of appeals held the district court's "factual findings demonstrate[d] that the road conditions physically interfered with the movement of traffic on a road

16

designed for public travel." Heyboer, ¶ 40. We disagree. "Interfere" means "to interpose in a way that hinders or impedes." Interfere, Merriam-Webster Online Dictionary https://perma.cc/2DUH-HZAD. "Physical" means "pertaining to real, tangible objects." Physical, Black's Law Dictionary (10th ed. 2014). The condition may arise on the road itself, or from the government's failure to maintain a safety device. Moldovan, 842 P.2d at 225-28 (holding that the plaintiff proved a dangerous condition interfered with the movement of traffic when the state failed to repair a fence, a cow ran through the broken fence onto the road, and a motorcyclist collided with the cow). Thus, for this element to be satisfied, a dangerous condition of the road—or a defective safety device related to the road—must hinder or impede the flow of traffic.

¶28 Here, neither the road nor any defective safety device hindered or impeded the movement of traffic. Rather, the third-party driver impeded Veres and Heyboer by cutting them off. Before the third-party driver entered the intersection, there is no proof that the road itself caused the motorcycle to act erratically, or that the motorcycle was unable to drive safely on the road. There is no evidence that any safety device malfunctioned, nor any evidence that the road's surface, prior to the third-party driver's actions, prevented the motorcycle driver from preforming as expected. So, the road did not physically interfere with the movement of traffic.

## IV. Conclusion

¶29 We reverse the judgment of the court of appeals, and we remand the case to that court for further proceedings consistent with this opinion.

**JUSTICE GABRIEL** dissents, and **JUSTICE HOOD** and **JUSTICE HART** join in the dissent.

JUSTICE GABRIEL, dissenting.

¶30 I agree with the majority that the division below erred in concluding that (1) the failure to keep a road in the same general state of repair or efficiency as it was initially constructed constitutes an unreasonable risk within the meaning of the Colorado Governmental Immunity Act ("CGIA"); and (2) a plaintiff satisfies his or her burden of proving an unreasonable risk to the health or safety of the public, within the meaning of section 24-10-103(1.3), C.R.S. (2017), when he or she shows that a governmental entity failed to restore a damaged road to its same state of efficiency or repair as initially constructed. Maj. op., ¶¶ 17–19. I further agree with the majority that an unreasonable risk for purposes of the CGIA cannot be defined solely in terms of foreseeability, as Heyboer asserts, because such a reading would effectively render the term "unreasonable" meaningless. Id. at ¶¶ 20–22. And I agree with the majority's determination that to establish an unreasonable risk in a case like this, a plaintiff must prove that the road condition created a chance of injury, damage, or loss that exceeds the bounds of reason. Id. at ¶ 23.

¶31 Nonetheless, unlike the majority, I believe that Heyboer has sufficiently established a waiver of the City's immunity because she has shown that her injuries resulted from a dangerous condition of a public highway, road, or street that physically interfered with the movement of traffic.

¶32 Accordingly, like the court of appeals division, I would reverse the district court's judgment dismissing Heyboer's claims, but I would do so on other grounds. I therefore respectfully dissent.

1

# I. Factual Background

¶33    The majority has set forth most of the pertinent facts of this case, and I need not repeat its factual recitation here. I note, however, several additional facts that are important to my analysis.

¶34    First, Veres testified, without contradiction, that the severe ruts in the road caused his motorcycle to jump and interfered with his ability to stop safely. He further testified that had the roadway been smooth, he would have been able to stop in time to avoid the collision.

¶35    Second, Heyboer's accident reconstruction expert opined that (1) the road's uneven surface limited Veres' ability to stop and to control his motorcycle; (2) the collision at issue would not have occurred had the road surface been smooth; and (3) the road's condition therefore physically interfered with the movement of traffic.

¶36    Third, the City's pavement engineer, Kennedy, conceded that (1) a road surface's condition is a factor in determining whether an intersection is dangerous and interferes with the movement of traffic; (2) the intersection at issue was in "very poor" condition and was "dangerous" at the time of the accident; and (3) the City knew of the intersection's condition before the accident, and, in fact, in the years and months leading to this accident, a number of citizens had advised the City that the intersection was dangerous.

¶37    Finally, the City conceded that it had a duty to maintain the road.

2

## II. Analysis

¶38     I begin by addressing our standard of review and the principles governing our interpretation of the CGIA.  I then discuss the pertinent provisions of the CGIA and apply the plain meanings of those provisions to the facts of this case.

### A.  Standard of Review and Pertinent Interpretive Principles

¶39     Whether governmental immunity applies to bar a lawsuit is a matter of the district court's jurisdiction.  Tidwell ex rel. Tidwell v. City & Cty. of Denver, 83 P.3d 75, 81 (Colo. 2003).  Accordingly, if raised before trial, the issue is properly addressed in a C.R.C.P. 12(b)(1) motion to dismiss.  Id.  When the jurisdictional issue involves factual disputes, an appellate court reviews the district court's findings under the clearly erroneous standard.  Id.  When, however, the facts are undisputed and the issue is one of law, an appellate court reviews the district court's jurisdictional ruling de novo.  Id.

¶40     We have often observed that the CGIA's immunity derogates Colorado's common law.  See, e.g., id.  As a result, we construe the CGIA's waiver provisions broadly and its exceptions to these waiver provisions strictly.  Id.

¶41     In light of the foregoing, when a plaintiff sues a governmental entity and that entity moves to dismiss on immunity grounds, we afford the plaintiff the reasonable inferences from his or her evidence.  Id. at 85.  And although the plaintiff bears the burden of establishing the court's jurisdiction, "the burden is a relatively lenient one." Id. at 86.

## B. CGIA

Section 24-10-106(1), C.R.S. (2017), provides in pertinent part:

Sovereign immunity is waived by a public entity in an action for injuries resulting from:

. . . .

(d)(I) [a] dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion, if paved, . . . of any public highway, road, street, or sidewalk within the corporate limits of any municipality.

A "dangerous condition, " in turn, is defined as

either a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of the public entity or public employee in constructing or maintaining such facility.

§ 24-10-103(1.3).

And as noted above, I agree with the majority's determination that in a case like this, a physical condition of a road constitutes an unreasonable risk to the health or safety of the public when the road's condition created a chance of injury, damage, or loss that exceeds the bounds of reason. See maj. op., ¶ 23.

Thus, in order to establish a waiver of sovereign immunity in a case like this, a plaintiff must show, under the relatively lenient standard described above, that his or her injuries resulted from a physical condition of the road that (1) created a chance of injury, damage, or loss exceeding the bounds of reason; (2) was known to the City;

4

(3) was caused by the City's negligence in constructing or maintaining the road; and (4) physically interfered with the movement of traffic.

¶46 Unlike the majority, I believe that Heyboer has carried her lenient burden of establishing each of these elements, and I address each element in turn.

¶47 First, in my view, Heyboer's injuries resulted from a physical condition of the road that created a chance of injury, damage, or loss exceeding the bounds of reason. City pavement engineer Kennedy conceded that the intersection was in "very poor" condition and that it was "dangerous" at the time of the collision, thus establishing that the physical condition of the road created a chance of injury, damage, or loss. In addition, Heyboer introduced evidence that this accident occurred because the road's condition prevented Veres from being able to stop his motorcycle. Specifically, Veres testified that the ruts in the road caused his motorcycle to jump, thereby interfering with his ability to stop safely. Moreover, Heyboer's accident reconstruction expert testified that the road's uneven surface limited Veres' ability to stop and to control his motorcycle and that the collision at issue would not have occurred had the road surface been smooth. In my view, this evidence sufficiently established that Heyboer's injury resulted from the road's condition. And given the City's admitted knowledge of the "very poor" and "dangerous" condition of this intersection, I believe that the risk of injury, damage, or loss posed by the road's condition exceeded the bounds of reason, at least for purposes of the lenient burden of proof necessary to defeat a motion to dismiss on immunity grounds.

¶48 Second, it is undisputed that the risk posed by the road's condition was well known to the City before the accident at issue occurred. Kennedy admitted that he had evaluated the intersection at issue and found its condition "very poor" and "dangerous."

¶49 Third, in my view, Heyboer sufficiently showed, for purposes of overcoming the City's motion to dismiss, that the risk of injury was caused by the City's negligence in maintaining the road. As the majority correctly observes, the government's duty to maintain a road is triggered only after the road becomes unreasonably dangerous. See maj. op., ¶ 18. At that point, the government has a duty to take the steps necessary to return the road to the same general state of being, repair, or efficiency as initially constructed. See id. Here, the City indisputably knew that the intersection at issue had become dangerous. City pavement engineer Kennedy conceded that. And for the reasons set forth above, I believe that the road's condition was unreasonably dangerous. Accordingly, the City had a duty to take steps to repair the road (indeed, the City conceded that it had a duty to maintain the road), and the City's failure to do so constitutes negligence.

¶50 Finally, as Heyboer's expert testified, the condition of the road at issue physically interfered with the movement of traffic. Specifically, the expert opined that the road's condition limited Veres' ability to stop and to control his motorcycle, and Veres' testimony that he could not stop because the ruts in the road caused his motorcycle to jump fully supports the expert's opinion. In my view, a road condition that impedes a

6

vehicle's ability to stop when necessary is a physical interference with the movement of traffic.

¶51 Accordingly, I believe that Heyboer has sufficiently established each of the elements necessary to support a waiver of sovereign immunity, particularly given our acknowledgment that her burden of proof in this regard was "relatively lenient." Tidwell, 83 P.3d at 86.

## III. Conclusion

¶52 For these reasons, I would conclude that the district court erred in dismissing Heyboer's claim on sovereign immunity grounds. I would therefore affirm the division's judgment, albeit on grounds different from those on which the division relied, and allow Heyboer's claim to proceed on the merits.

¶53 Accordingly, I respectfully dissent.

I am authorized to state that JUSTICE HOOD and JUSTICE HART join in this dissent.