Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

## 2022 CO 10

**No. 20SC646,** *Maphis v. City of Boulder* — **Colorado Governmental Immunity Act** — **Sovereign Immunity** — **Dangerous Condition.**

The supreme court reviews de novo the legal question of whether a sidewalk deviation constituted a "dangerous condition" under the Colorado Governmental Immunity Act ("CGIA"). After tripping and falling over a two-and-a-half-inch sidewalk deviation in the City of Boulder, the plaintiff sued the City for her injuries under the CGIA. The City moved to dismiss the plaintiff's suit, arguing that the sidewalk deviation did not constitute a "dangerous condition" — defined as an "unreasonable risk to the health and safety of the public" — that would waive its immunity from suit. Applying the standard set forth in *City & Cty. of Denver v. Dennis*, 2018 CO 37, 418 P.3d 489, to the undisputed facts of this case, the supreme court holds that the sidewalk condition did not create a chance of injury, damage, or loss which exceeds the bounds of reason. Accordingly, the supreme court affirms the court of appeals judgment.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2022 CO 10

## Supreme Court Case No. 20SC646

*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. **19CA203**

### Petitioner:

Joy Maphis,

v.

### Respondent:

City of Boulder, Colorado.

### Judgment Affirmed

*en banc*
February 22, 2022

**Attorneys for Petitioner:**
Randall J. Paulsen & Associates, P.C.
Randall J. Paulsen
   *Westminster, Colorado*

O'Brien Law Firm, LLC
Shauna O'Brien
   *Westminster, Colorado*

**Attorneys for Respondent:**
Office of the City Attorney
Sandra M. Llanes
Luis A. Toro
   *Boulder, Colorado*

**Attorney for Amicus Curiae Colorado Intergovernmental Risk Sharing Agency:**
Samuel J. Light
  *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Municipal League:**
David W. Broadwell
Laurel Witt
  *Denver, Colorado*

**Attorney for Amicus Curiae Colorado Trial Lawyers Association:**
Just Law Group, LLC
John F. Poor
  *Denver, Colorado*

**JUSTICE HART** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE HOOD**, and **JUSTICE BERKENKOTTER** joined. **JUSTICE MÁRQUEZ**, joined by **JUSTICE GABRIEL** and **JUSTICE SAMOUR**, dissented.

JUSTICE HART delivered the Opinion of the Court.

¶1 After tripping over a deviation in a sidewalk in the City of Boulder ("City"), Joy Maphis sued the City for her injuries under the Colorado Governmental Immunity Act ("CGIA"). The City moved to dismiss for lack of subject matter jurisdiction, arguing that it was immune from suit as the sidewalk did not constitute a "dangerous condition" under section 24-10-106(1)(d)(1), C.R.S. (2021), of the CGIA. The district court denied the City's motion based on its finding that the deviation was "difficult to detect" and was larger than what the City classified as a "hazard" warranting repair. The City appealed, and the court of appeals reversed, concluding that the undisputed evidence failed to establish that the sidewalk presented the type of dangerous condition for which the City had waived its immunity from suit.[1]

---

[1] We granted certiorari to review the following issues:

1. Whether the court of appeals erred by reviewing the trial court's findings of fact for clear error and its legal conclusion—that the sidewalk did not constitute such a dangerous condition as to waive Boulder's immunity—de novo.

2. Whether the court of appeals erred by holding that the sidewalk did not constitute a dangerous condition for purposes of waiving Boulder's immunity pursuant to the Colorado [Governmental] Immunity Act, section 24-10-106(1)(d)(1), C.R.S. (2020).

3

¶2    We agree with the court of appeals that Maphis failed to establish a waiver of immunity. Reviewing de novo the legal question of whether the sidewalk constituted a dangerous condition under the CGIA, we hold that Maphis's evidence did not establish that the sidewalk deviation presented a risk that "exceeded the bounds of reason." *City & Cty. of Denver v. Dennis*, 2018 CO 37, ¶ 23, 418 P.3d 489, 497. Accordingly, we affirm the court of appeals and hold that the City retained its immunity from suit under the CGIA.

## I. Facts and Procedural History

¶3    On April 8, 2017, Maphis tripped over a two-and-a-half-inch deviation in a concrete sidewalk in the City and fell, fracturing both elbows and injuring her face. The City had identified the sidewalk as needing repair just weeks earlier and was only a few days away from making those repairs at the time of her fall.

¶4    Maphis filed suit against the City to recover for her injuries, alleging that the City was liable because it knew of the dangerous condition of the sidewalk yet failed to correct the condition or warn pedestrians of its existence.[2] The City moved to dismiss Maphis's claim for lack of subject matter jurisdiction under

---

[2] Maphis also brought a negligence per se claim against a private party, Moreland Family LTD Partnership, for failure to maintain the sidewalk adjacent to their property pursuant to Boulder Municipal Code § 8-2-6. That claim is not at issue on appeal.

4

section 24-10-106(1)(d)(1), which waives governmental immunity for a "dangerous condition." It alleged, in part, immunity from suit because the deviation in the sidewalk was not "unreasonably dangerous" under the standard for what constitutes a "dangerous condition," as articulated by this court in *Dennis*, ¶ 23, 418 P.3d at 497.

¶5 To determine whether the City had waived its immunity, the district court held an evidentiary hearing pursuant to *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916 (Colo. 1993). Both Maphis and the City's Principal Transportation Projects Engineer, Gerrit Slatter, testified. Maphis testified to the extent of her injuries and to the fact that the deviation "was invisible. You couldn't see it when you were walking." She further testified that, in her opinion, the deviation was unreasonably dangerous.

¶6 Slatter testified about the City's sidewalk repair program and the condition of the sidewalk. He first explained that the City runs both a proactive and a reactive repair program. Through the proactive program, the City independently identifies and repairs damaged sidewalks as it works through geographic zones; while through the reactive program, the City receives a complaint or concern about a particular sidewalk and fixes it. Under the proactive program, Slatter explained, the City (1) "consults with an engineering consultant [who] goes through the zone to identify areas that are in need of repair . . . and . . . develop[s]

an exhibit and a cost estimate"; (2) "use[s] that to work with a contractor to develop a scope of work and get a construction estimate"; (3) has "a public engagement effort" to "notify the neighborhood . . . that there will be sidewalk repair work happening over the coming year or two"; (4) "send[s] individual letters . . . indicating whether a repair will be implemented in front of their property"; and (5) has an "engineering technician[ ] . . . field visit and field edit the recommendations from the consultant to make sure that there is concurrence with the recommendations" and, "if they identify other repairs that may be needed within the zone, they . . . mark those locations and then notify the adjacent property owners."    Here, Slatter testified, the sidewalk deviation was not identified in the initial review of the geographic zone in 2015.  It was identified and "marked . . . for repair" during the field visit by the City's engineering technician shortly before the previously scheduled repairs for the zone were going to take place.

¶7      Slatter further agreed to the fact that "a deviation greater than three quarters of an inch constitutes a hazard" under the City's sidewalk repair program and that such a deviation indicates the sidewalk is unsafe as "a potential tripping hazard." He also explained that when the sidewalk repair program was "conceived in 2010, the thought was that there would be sufficient funding to . . . address all the sidewalk repair needs within a geographic zone on a yearly basis."  However,

6

"budget limitations and being able to address the repairs that are needed" mean that the City needs "a couple of years" to work through each zone.

¶8 After the *Trinity* hearing, the district court issued a minute order concluding that the City waived its immunity because the sidewalk deviation "constituted a 'dangerous condition.'" It specifically found that:

- "a sidewalk deviation greater than [three quarters] of an inch constitutes a 'hazard' by the City's own definition";

- the deviation of the sidewalk was approximately two-and-a-half inches in height at the time of Maphis's fall; and

- the deviation was "largely imperceptible."

On these facts, the district court reasoned that because "the coloring of the sidewalk ma[de] the deviation difficult to detect, increase[d] the degree of the tripping hazard, and thus the risk to the walking public," it constituted an "unreasonable risk of harm to the health and safety of the public, such that [Maphis] . . . over[came] her burden to prove that the City . . . waived its immunity."

¶9 The City appealed the district court's order, and, in a divided opinion, a division of the court of appeals reversed. *Maphis v. City of Boulder*, No. 19CA0203 (June 25, 2020). Reviewing de novo the question of whether the deviation in the sidewalk constituted a "dangerous condition," the division majority concluded that while "there is little doubt that the sidewalk's condition created *some* risk" as

7

a tripping hazard, that risk was not one that "exceeded the bounds of reason" under the standard set forth by this court in *Dennis*. *Maphis* at ¶ 26. In particular, the division noted that the undisputed facts showed (1) the City had received no citizen complaints about this sidewalk deviation; (2) the deviation had not been identified as needing repair during the City engineer's assessment of the zone in 2015 but had instead been identified during a routine area inspection just weeks before the accident; and (3) undisputed testimony and exhibits at the *Trinity* hearing demonstrated that uneven sidewalks are commonplace in Boulder. *Id.* at ¶ 26. Given these facts, the division majority concluded that the sidewalk deviation did not constitute a "dangerous condition" for purposes of waiving the City's immunity under the CGIA. This conclusion, the division explained, aligns with the "General Assembly's intent to lessen potential burdens on taxpayers, and to permit municipalities to prioritize repairs." *Id.* at ¶ 32.

Judge Richman, dissenting, reasoned that the City "created a dangerous condition and its failure to act [was] unreasonable" because it had identified the sidewalk for repair but had not yet repaired it at the time of Maphis's fall. *Id.* at ¶ 44.

Maphis petitioned this court for certiorari, and we granted review.

8

## II. Analysis

¶12 We begin by explaining that questions of sovereign immunity under the CGIA present mixed questions of fact and law, with jurisdictional facts reviewed for clear error and the question of whether those facts constitute a "dangerous condition" for purposes of the CGIA reviewed de novo. We then review de novo whether the sidewalk deviation in this case constituted a dangerous condition under the standard for "unreasonable risk" announced in *Dennis*. We conclude that it did not.

### A. Standard of Review

¶13 Whether the CGIA applies to protect the government from suit is a question of subject matter jurisdiction governed by the standard for dismissal pursuant to C.R.C.P. 12(b)(1). *Dennis*, ¶¶ 9–10, 418 P.3d at 494; *St. Vrain Valley Sch. Dist. RE-1J v. Loveland*, 2017 CO 54, ¶ 10, 395 P.3d 751, 754. As such, the plaintiff carries the burden of proof to show that the government waived its immunity. *Dennis*, ¶ 11, 418 P.3d at 494; *see also City & Cty of Denver v. Crandall*, 161 P.3d 627, 632 (Colo. 2007) (explaining that "in a *Trinity* hearing on a C.R.C.P. 12(b)(1) motion to dismiss, the plaintiff must carry the burden of proving jurisdictional facts adequate to support subject matter jurisdiction"). But "this burden is relatively lenient" in the CGIA context "as the plaintiff is afforded the reasonable inferences from [their] undisputed evidence." *Dennis*, ¶ 11, 418 P.3d at 494.

¶14 It is well-established that the application of sovereign immunity presents a mixed question of fact and law. *See id.* at ¶ 12, 418 P.3d at 494 (explaining the standard of review for determining whether sovereign immunity applies); *St. Vrain Valley Sch. Dist. RE-1J*, ¶ 10, 395 P.3d at 754 (same); *Crandall*, 161 P.3d at 633 (same); *Tidwell ex rel. Tidwell v. City & Cty. of Denver*, 83 P.3d 75, 81 (Colo. 2003) (same). The district court makes "factual findings about its ability to hear the case," *Dennis*, ¶ 9, 418 P.3d at 494, and resolves "any factual dispute[s] upon which the existence of jurisdiction may turn," *Swieckowski v. City of Ft. Collins*, 934 P.2d 1380, 1384 (Colo. 1997). On appellate review, we defer to the district court's factual findings unless they are clearly erroneous. *Dennis*, ¶ 12, 418 P.3d at 494.

¶15 "Once the questions of fact are resolved, we review questions of governmental immunity de novo," *id.*, as the only remaining question "is one of statutory interpretation," *St. Vrain Valley Sch. Dist. RE-1J*, ¶ 10, 395 P.3d at 754. When interpreting a statute, our goal is to give effect to legislative intent. *Elder v. Williams*, 2020 CO 88, ¶ 18, 477 P.3d 694, 698. In doing so, we look at the statute "as a whole, giving consistent, harmonious, and sensible effect to all of its parts." *Dennis*, ¶ 12, 418 P.3d at 494.

¶16 Applying these principles, we now review de novo whether the condition of the sidewalk on which Maphis tripped constitutes a "dangerous

10

condition"—and whether the City thus waived its governmental immunity under section 24-10-106(1)(d)(1) of the CGIA.

## B. A "Dangerous Condition" Under the CGIA Is a Physical Condition that Constitutes an Unreasonable Risk

¶17 The CGIA provides immunity to public entities in claims for injuries that lie in or could lie in tort but waives this immunity in certain limited circumstances. § 24-10-106. Responding to this court's prior abrogation of sovereign immunity, the General Assembly enacted the CGIA with the purposes of (1) protecting governments from unlimited liability that could "disrupt or make prohibitively expensive the provision of . . . essential public services," § 24-10-102, C.R.S. (2021); (2) protecting taxpayers "against excessive fiscal burdens" as they would "ultimately bear the fiscal burdens of unlimited liability," *id.*; and (3) "permit[ting] a person to seek redress for personal injuries caused by a public entity" in circumstances identified in the statute, *State v. Moldovan*, 842 P.2d 220, 222 (Colo. 1992). Because the CGIA derogates the common law, we construe its immunity provisions strictly but waiver provisions broadly. *Elder*, ¶ 20, 477 P.3d at 698.

¶18 At issue in this case is the provision that waives immunity in an action for injuries resulting from the "dangerous condition of a . . . sidewalk." § 24-10-106(1)(d)(1). The CGIA expressly defines a "dangerous condition" as "a physical condition . . . that constitutes an *unreasonable risk* to the health or safety of the public." § 24-10-103(1.3), C.R.S. (2021) (emphasis added).

11

¶19 In *Dennis*, we held that "'unreasonable' in this context means 'exceeding the bounds of reason or moderation.'" ¶ 23, 418 P.3d at 497 (quoting *Unreasonable*, Webster's Third New International Dictionary (unabr. ed. 2002)). We explained that because the term "unreasonable" modifies the word "risk," the CGIA requires "*more* than a *foreseeable* risk of harm." *Id.* at ¶ 22, 418 P.3d at 497 (emphases added). In other words, there are "situations when there is a chance the [condition] could cause an injury, or it is foreseeable that [it] could cause an injury" but the government nonetheless does not waive its immunity. *Id.* This balance is necessary because the CGIA waives governmental immunity in a narrower class of circumstances than those that might subject a private entity to liability.

¶20 Applying this standard in *Dennis*, we held that the condition of a road, though somewhat deteriorated, was not unreasonable. There, a passenger on a motorcycle was injured at an intersection in Denver when the driver of a car turned in front of the motorcycle and "effectively [cut] off" the motorcycle. *Id.* at ¶ 3, 418 P.3d at 493. The driver of the motorcycle attempted to stop before hitting the car but was unable to, and the passenger was flung from the motorcycle and suffered severe injury. *Id.* The passenger sued the City and County of Denver ("Denver") alleging that the condition of the road at the intersection prevented the driver from effectively stopping the motorcycle. *Id.* at ¶ 4, 418 P.3d at 493.

¶21 Reviewing whether the condition of the road constituted a "dangerous condition," we found that the plaintiff presented evidence showing a "deteriorated road"—i.e., "cracked and rutted"—"but not a road which was *unreasonably risky* on which to drive." *Id.* at ¶ 26, 418 P.3d at 498 (emphasis added). We explained that "while [the plaintiff] is afforded the inferences of her undisputed evidence, she nevertheless bore the burden of proving that the road constituted an unreasonable risk." *Id.* And we concluded that the plaintiff had not met that burden. Thus, Denver had not waived its governmental immunity.

¶22 We reiterate today that to prove the "dangerous condition" element of the immunity waiver, a plaintiff must show that the "condition created a chance of injury, damage, or loss which exceeded the bounds of reason." *Id.* at ¶ 23, 418 P.3d at 497. Assessing whether the plaintiff has met this burden requires examining the totality of the circumstances presented by the undisputed evidence as to whether that particular condition presented an unreasonable risk. *Id.*

### C. The Sidewalk Deviation Did Not Constitute a Dangerous Condition

¶23 Turning to the present case, we now consider whether Maphis met her burden to show that the sidewalk condition created a chance of injury, damage, or loss which exceeded the bounds of reason, such that the City could be liable for her injuries.

13

¶24    Maphis contends that the sidewalk condition constituted an unreasonable risk because the two-and-a-half-inch deviation exceeded the City's criteria for a tripping hazard by three fold and its coloration made it hard to see.  On the undisputed facts at the *Trinity* hearing, we agree with the division that these factors alone do not outweigh the evidence demonstrating that this sidewalk condition—while undeniably significant for Maphis—did not constitute the type of "dangerous condition" for which the CGIA waives governmental immunity.

¶25    First, we note that the condition was not unreasonable merely because the deviation exceeded the City's criteria for a "hazard" needing repair and the City had therefore marked it for repair.  "Hazard" is synonymous with "risk."  *Hazard*, Merriam-Webster Online, https:/ /www.merriam-webster.com/dictionary/hazard [https://perma.cc/6QRY-M39T].  And, as we observed in *Dennis*, the term "unreasonable" modifies the word "risk" in the CGIA.  ¶ 23, 418 P.3d at 497.  Thus, the mere fact that the City was aware of the deviation and had scheduled it for repair because they classified it as a hazard is not enough to qualify it as an "unreasonable risk."  The statutory language requires looking beyond the City's criteria to determine whether the acknowledged hazard is one that exceeded the bounds of reason.

¶26    Further, the fact that the City had identified the deviation as needing repair does not make the risk it presents an unreasonable one.  Certainly, once the City

14

had identified the deviation for repair—just weeks before the accident—the risk was foreseeable. But, as we explained in *Dennis*, a waiver of immunity requires more than foreseeable risk. ¶ 22, 418 P.3d at 497.

¶27 Giving Maphis the benefit of all reasonable inferences from the undisputed evidence, the coloration of the sidewalk here did make the two-and-a-half-inch deviation "difficult to detect." And the fact that the deviation was three times the height of the City's "hazard" criteria might also have increased the risk it presented. But the degree of risk still did not exceed the bounds of reason as (1) deviations in slab sidewalks are commonplace throughout Colorado due to the harsh climate and other environmental factors; (2) the deviation was located in a residential area without any heightened safety concerns; and (3) the City had not received any citizen reports through its reactive program about the sidewalk.[3]

¶28 Of course, in examining the totality of the circumstances shown by the undisputed facts in a different case, there certainly could be instances where a two-and-a-half-inch sidewalk deviation *would* constitute a dangerous condition. For example, the location of such a deviation in a high foot-traffic area or an area of

---

[3] The City might have done well to more clearly mark this deviation while it was awaiting repair. However, "[n]egligent failure to warn" does not "trigger[] a waiver of immunity under the CGIA." *Medina v. State*, 35 P.3d 443, 449 (Colo. 2001).

15

heightened public safety concern—such as at the entrance of an assisted-living facility, hospital, school, or daycare—or frequent citizen reporting of the condition would be additional evidence that might help a plaintiff meet the burden of proof. But none of these facts is present here. The City did not receive any complaints about this sidewalk deviation and only identified it independently for proactive repair on a second review of the neighborhood sidewalks just weeks before it was repaired.

¶29 Maphis argues that the relative frequency of sidewalk deviations should not influence our reasonableness analysis as it lets municipalities off the hook for dangerous conditions just because those conditions are widespread. But the purposes of the CGIA suggest that the frequency with which a particular condition occurs is an appropriate consideration when evaluating whether governmental immunity has been waived. As the amicus brief submitted by the Colorado Municipal League explained, "no municipal sidewalk system is perfectly hazard-free at all times," and local governments seeking to maintain their sidewalks are constrained not only by budgetary limitations, but also by the availability of contractors who can do the needed repairs. *See Brief Amici Curiae, the Colorado Municipal League and the Colorado Intergovernmental Risk Sharing Agency, in Support of the City of Boulder*, at 2. We cannot ignore the realities that Colorado's local governments face in trying to maintain roads and sidewalks. As we explained in

*Dennis,* doing so would impose an "impossibly high standard" whereby "state and local governments [must] keep [sidewalks] like new at all times."  ¶ 19, 418 P.3d at 496.  This would significantly increase—not reduce—potential burdens on taxpayers.  We described in *Dennis*, and we emphasize here:

> The [City] could not simultaneously fix every [sidewalk]; some [sidewalks] would be prioritized and renovated before others.  And when a [pedestrian] was injured on one of the non-prioritized [sidewalks] that were awaiting renovation, the government would be potentially liable for not fixing the [sidewalk].  Thus, the taxpayers would be footing both the costs of making [sidewalks] like new and the costs of potential lawsuits.

*Id.*

¶30    Thus, based on the totality of the circumstances presented by the undisputed evidence in this case, we hold that Maphis failed to establish that the sidewalk deviation created a chance of injury, damage, or loss which exceeded the bounds of reason.

## III. Conclusion

¶31    Reviewing de novo whether Maphis established that the sidewalk deviation created an unreasonable risk to the health and safety of the public, we agree with the court of appeals that she did not.  Therefore, we affirm that the City's governmental immunity has not been waived under the "dangerous condition" provision of the CGIA.

JUSTICE MÁRQUEZ, joined by JUSTICE GABRIEL and JUSTICE SAMOUR, dissented.

¶32 The General Assembly has expressly waived governmental immunity for injuries resulting from a "dangerous condition" of a sidewalk. § 24-10-106(1)(d)(I), C.R.S. (2021). For that waiver to be given a meaningful effect, it must apply to conditions as severe as the sidewalk deviation at issue here: a nearly imperceptible, two-and-a-half-inch vertical deviation that was known to the City of Boulder, deemed an unsafe "hazard" under its own standards, and was scheduled for repair. I disagree with the majority's conclusion that the sidewalk deviation here did not, as a matter of law, constitute a "dangerous condition" as contemplated by the Colorado Governmental Immunity Act ("CGIA"). Because the majority opinion effectively narrows the scope of the CGIA's waiver of immunity and creates an unjust result under the circumstances of this case, I respectfully dissent.

## I. Factual Background

¶33 Joy Maphis was seriously injured when she tripped over a deviation in a residential sidewalk a few blocks from a commercial area in Boulder, Colorado. She fell, landing on her elbows and her face. Her left elbow was broken, and her right elbow was shattered. Maphis required sutures to repair her lip, and she underwent two surgeries to regain a meaningful range of motion in her right

1

elbow. At the time of the *Trinity* hearing in this case, Maphis testified that she still could not straighten her left arm and was in constant pain.

¶34 The City was aware of the specific sidewalk deviation that caused Maphis's fall because workers had identified it during a routine inspection a month prior to Maphis's injury. Under the City's guidelines, a deviation greater than three quarters of an inch is considered a "hazard." The City's engineer acknowledged at the *Trinity* hearing that such deviations make the sidewalk "unsafe." The two-and-a-half-inch deviation here was more than three times that size. City workers had marked the sidewalk and scheduled it for repair. Unfortunately, the City did not complete those repairs until two days after Maphis tripped and fell.

¶35 The deviation here was not only serious, but the district court also found that it was "largely imperceptible." Maphis testified that she could not see the deviation because the coloring of the concrete on the vertical face of the slab blended in with the coloring of its top surface. Photographs of the sidewalk admitted into evidence at the *Trinity* hearing confirmed her testimony. Although the City had identified the deviation and scheduled it for repair, it did not mark the area (with orange paint or cones, for example) to make the hazard more visible to pedestrians.

2

## II. The Sidewalk Deviation Constituted a "Dangerous Condition"

¶36 The CGIA expressly waives a public entity's immunity from suit in an action seeking compensation for injuries resulting from a "dangerous condition" of any public sidewalk within the corporate limits of a municipality. § 24-10-106(1)(d)(I). The CGIA defines a "dangerous condition" as

> a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of the public entity or public employee in constructing or maintaining such facility.

§ 24-10-103(1.3), C.R.S. (2021).

¶37 To establish a "dangerous condition"—and thus, a waiver of immunity under section 24-10-106(1)(d)(I)—a plaintiff must show that her injury resulted from (1) the physical condition of a facility or the use thereof; (2) which constituted an unreasonable risk to the health or safety of the public; (3) which was known to exist or should have been known to exist in the exercise of reasonable care; and (4) which was proximately caused by the negligent act or omission of the public entity in constructing or maintaining the facility. *Medina v. State*, 35 P.3d 443, 454 (Colo. 2001); *see also St. Vrain Valley Sch. Dist. RE-1J v. Loveland*, 2017 CO 54, ¶ 16, 395 P.3d 751, 755. Here, there is no dispute that Maphis's injuries resulted from the physical condition of the sidewalk; that the City knew about this specific

sidewalk deviation; and that the condition of the sidewalk was a result of the City's failure to maintain it. The only dispute is whether the condition of the sidewalk constituted "an unreasonable risk to the health or safety of the public." § 24-10-103(1.3).

¶38 To prove that a condition poses an "unreasonable risk," the plaintiff must show that the condition "created a chance of injury, damage, or loss which exceeded the bounds of reason." *City & Cty. of Denver v. Dennis*, 2018 CO 37, ¶ 23, 418 P.3d 489, 497. Although I agree with the majority that the ultimate determination of whether the City has waived its governmental immunity is a question of law reviewed de novo, maj. op. ¶ 16, the determination of whether a particular condition presents an unreasonable risk "will necessarily be a fact-specific inquiry." *Dennis*, ¶ 23, 418 P.3d at 497.

¶39 The facts here show that Maphis carried her burden of establishing that the sidewalk deviation presented an unreasonable risk. The two-and-a-half-inch vertical deviation that caused Maphis to trip was more than three times the size of a deviation the City itself considered to render a sidewalk unsafe. While not every deviation exceeding the City's three-quarter-inch standard automatically constitutes a dangerous condition, the deviation here far exceeded what the City itself deemed to require repair given the risk of injury it created. Moreover, the City had actually flagged and scheduled this particular sidewalk deviation for

4

repair. In addition, the deviation here was also largely imperceptible, even during daylight hours, because the coloring of the slab's vertical plane matched the slab's top surface—yet the City did not visibly mark the deviation or otherwise take action to reduce pedestrians' risk of injury while repairs were pending.[1] In short, the known hazard in this case created a chance of injury that exceeded the bounds of reason.

¶40 Our reasoning in *Dennis* actually supports the trial court's conclusion here. We held in *Dennis* that the deteriorated condition of the road there carried "*some risk*," but that the risk was not unreasonable. *Id.* at ¶ 25, 418 P.3d at 497. In reaching that conclusion, however, we pointed to the absence of certain factors that are clearly present in this case.

¶41 First, there was conflicting testimony in *Dennis* as to whether the condition of the road caused the collision (by preventing the motorcycle from stopping quickly enough to avoid the car that had turned in front of it). *Id.* at ¶ 24, 418 P.3d at 497. In other words, there were unresolved questions regarding whether the deteriorated road condition played a role in causing the accident. *Id.* Here, there

---

[1] While I acknowledge that a claim under the CGIA cannot be predicated solely on a failure to warn, *see Medina*, 35 P.3d at 449, the failure to call attention to the hazard here, particularly given how difficult it was to perceive, is relevant to determining whether it was unreasonably dangerous.

is no such question. The vertical deviation in the sidewalk clearly caused Maphis to trip and fall, resulting in her serious injuries.

¶42 Second, in *Dennis*, the city's pavement engineer testified that he had inspected the road at that intersection a week before the accident and determined that it did not require immediate repair. *Id.* at ¶ 25, 418 P.3d at 498. Moreover, although the intersection was rated as "very poor" under the city's internal analysis, the city's rating system was "not related to how safe or dangerous a road is" but served only to assist the city in determining maintenance needs and priorities. *Id.* at ¶ 5, 418 P.3d at 493. Here, by contrast, the City had identified and scheduled this sidewalk deviation for repair (and completed those repairs, albeit two days after Maphis's accident). In addition, the City's engineer acknowledged that under the City's standards, a sidewalk deviation greater than three quarters of an inch is considered a hazard that makes the sidewalk "unsafe."

¶43 Third, we emphasized in *Dennis* that the road, while cracked and rutted, did not contain potholes or sinkholes "or any other road characteristics *such as a raised pavement lip* that could damage a vehicle and lead to an accident." *Id.* at ¶ 26, 418 P.3d at 498 (emphasis added). For this reason, we concluded that although the road was deteriorated, it was not a road on which it was unreasonably risky to drive. *Id.* Yet the vertical sidewalk deviation here presented the very type of hazard to a pedestrian that was missing from the facts evaluated in *Dennis*.

6

¶44 In sum, the analysis in *Dennis* should lead us to affirm the district court's conclusion here that the sidewalk deviation was a "dangerous condition" for purposes of the CGIA. In holding otherwise, the majority misapplies *Dennis*.

¶45 The majority concedes that "there certainly could be instances where a two-and-a-half-inch sidewalk deviation *would* constitute a dangerous condition" sufficient to waive immunity. Maj. op. ¶ 28. However, the majority apparently would limit such circumstances to "high foot-traffic area[s]," "area[s] of heightened public safety concern," and sidewalk conditions that citizens have frequently reported. *Id.* Although such circumstances are certainly relevant to determining whether a sidewalk deviation constitutes a dangerous condition, they cannot serve to restrict the CGIA's waiver of immunity. *See Dennis*, ¶ 14, 418 P.3d at 495 ("Because the CGIA derogates common law, we construe its waivers of immunity broadly.").

¶46 I fear the majority's ruling today effectively precludes any tort claim against a municipality for the dangerous condition of a sidewalk—even a known hazardous condition that poses an unreasonable risk of injury—unless the condition occurs in a "high foot-traffic area" or "an area of heightened public safety concern." Nothing in the CGIA suggests that we must construe the waiver of immunity for the dangerous condition of a public sidewalk so narrowly. A known, physical condition capable of causing the serious injuries sustained here

7

cannot be deemed *within* the bounds of reason simply because it was located in an area of the city with lighter pedestrian traffic. As the facts of this case demonstrate, tripping over a sidewalk deviation (regardless of its location within a municipality) can result in serious, long-term injuries. True, the CGIA is aimed, in part, at preventing unlimited liability of the government, but its waivers of sovereign immunity are intended to allow individuals to seek redress for injuries caused by the government. Indeed, this is "one of the basic but often overlooked" purposes of the CGIA. *Daniel v. City of Colo. Springs*, 2014 CO 34, ¶ 13, 327 P.3d 891, 895 (quoting *State v. Moldovan*, 842 P.2d 220, 222 (Colo. 1992)). In my view, today's ruling overlooks that purpose.

### III. Conclusion

¶47 A finding that immunity has been waived does not mean that Maphis wins; it means only that she may bring her case to trial, where she would still have to prove the City's negligence to prevail. But the majority's opinion today precludes her from even having that opportunity.

¶48 The CGIA clearly waives immunity for claims seeking compensation for injuries resulting from the dangerous condition of a public sidewalk. Because I believe Maphis established that the sidewalk deviation here constituted a "dangerous condition" sufficient to establish the waiver of immunity under section 24-10-106(1)(d)(I), I respectfully dissent.

8